Matthew W.H. Wessler*
Michael Skocpol* (D.C. Bar No. 1659449)
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
Telephone: (202) 888-1741
michael@guptawessler.com

Anthony Paronich
PARONICH LAW PC
350 Lincoln St., Suite 2400
Hingham, MA 02043
Telephone: (508) 221-1510
anthony@paronichlaw.com

*Counsel for Plaintiff Chet Michael Wilson*

*admitted pro hac vice*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Chet Michael Wilson, individually and as representative of the class, | Case No. 2:25-cv-01481-MTL |
| Plaintiff, | |
| v. | PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS |
| Mountainside Fitness Acquisition LLC, | |
| Defendant. | |

1

## <u>TABLE OF CONTENTS</u>

Table of Authorities..............................................................................................................ii

Introduction ....................................................................................................................... 1

Facts................................................................................................................................... 2

Legal Standard................................................................................................................... 2

Argument ........................................................................................................................... 3

    I.       The TCPA's Do Not Call List provisions protect cell phone subscribers .... 3

          A.      The text of § 227(c) establishes that cell phone subscribers
                 are "residential telephone subscribers" eligible for Do Not
                 Call List protection............................................................................. 3

          B.      Subsequent congressional action confirms that reading of
                 § 227(c) ............................................................................................. 6

          C.      At the very least, Congress intended the FCC to decide
                 this question ...................................................................................... 8

    II.      The text of § 225(c) authorizes suits for unwanted text messages.............. 11

    III.    The Court should not dismiss Mr. Wilson's request for treble
          damages or his request for injunctive relief ................................................. 16

Conclusion........................................................................................................................ 17

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Barnhart v. Peabody Coal Co.,*
4
    537 U.S. 149 (2003)............................................................................................10

5

*Cacho v. McCarthy & Kelly, LLP,*
6
    739 F. Supp. 3d 195 (S.D.N.Y. 2024) ..............................................3, 4, 5, 6

7

*Campbell-Ewald Co. v. Gomez,*
8
    577 U.S. 153 (2016) ..........................................................................................13

9

*Chennette v. Porch.com,*
10
    50 F.4th 1217 (9th Cir. 2022) .................................................................1, 3, 8

11

*Davis v. CVS Pharmacy, Inc.,*
12
    2025 WL 2491195 (N.D. Fla. 2025).........................................................14, 15

13

*Davis v. HSBC Bank Nevada, N.A.,*
14
    691 F.3d 1152 (9th Cir. 2012) ......................................................................12

15

*Dawson v. Porch.com,*
16
    2024 WL 4765159 (W.D. Wash. 2024)......................................................13

17

*Ferrell v. Colourpop Cosmetics, LLC,*
18
    2025 U.S. Dist. LEXIS 140893 (C.D. Cal. 2025).......................................10

19

*Food Marketing Institute v. Argus Leader Media,*
20
    588 U.S. 427 (2019).............................................................................................6

21

*Gale v. Unifi Aviations, LLC,*
22
    2025 WL 991100 (S.D. Cal. 2025)..............................................................17

23

*GTE Service Corp. v. FCC,*
24
    224 F.3d 768 (D.C. Cir. 2000)........................................................................7

25

*Harriel v. Bealls, Inc.,*
26
    2025 WL 2379617 (M.D. Fla. 2025)...........................................................10

27

*Isaacs v. USHealth Advisors, LLC,*
28
    2025 WL 2268359 (N.D. Ga. 2025)..........................................................4, 6

*Jackson v. Direct Building Supplies LLC,*
    2024 WL 184449 (M.D. Pa. 2024) ...............................................................4

*Jones v. Blackstone Medical Services, LLC,*
    2025 WL 2042764 (C.D. Ill. 2025) ............................................................... 14, 15

*Keating v. Peterson's Nelnet, LLC,*
    615 F. App'x 365 (6th Cir. 2015) .............................................................. 12

*Keifer v. HOSOPO Corp.,*
    2018 WL 5295011 (S.D. Cal. 2018) .......................................................... 17

*Krakauer v. Dish Network, LLC,*
    925 F.3d 643 (4th Cir. 2019) .................................................................. 13

*Leo India Films Ltd. v. GoDaddy.com LLC,*
    2023 WL 3740567 (D. Ariz. 2023) ........................................................... 17

*Lirones v. Leaf Home Water Solutions, LLC,*
    2024 WL 4198134 (N.D. Ohio 2024) ...................................................... 4, 10

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369, 395 (2024) ................................................................. 9, 10, 16

*Lyman v. QuinStreet, Inc.,*
    2024 WL 3406992 (N.D. Cal. 2024) ....................................................... 5, 10

*Marx v. General Revenue Corp.,*
    568 U.S. 371 (2013) ............................................................................ 6

*McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.,*
    606 U.S. 146 (2025) ......................................................................... 1, 10

*National Cable & Telecom Association v. FCC,*
    567 F.3d 659 (D.C. Cir. 2009) ......................................................... 6, 12, 15

*New Prime Inc. v. Oliveira,*
    586 U.S. 105 (2019) ......................................................................... 3, 15

*NLRB v. SW General, Inc.,*
    580 U.S. 288 (2017) ............................................................................ 6

*Omar v. Arizona,*
    2023 WL 2838036 (D. Ariz. 2023) ........................................................... 2

*Oncale v. Sundowner Offshore Services, Inc.,*
    523 U.S. 75 (1998) .................................................................... 6, 12, 15

*Pacleb v. Cops Monitoring,*
    2014 WL 3101426 (C.D. Cal. 2014) .......................................................... 17

*Pfizer, Inc. v. Government of India*,
    434 U.S. 308 (1978) ........................................................................................... 4

*Physicians Surgery Center of Chandler v. Cigna Healthcare Inc.*,
    609 F. Supp. 3d 930 (D. Ariz. 2022) ............................................................... 17

*Pickens v. Hamilton-Ryker IT Solutions, LLC*,
    133 F.4th 575 (6th Cir. 2025) ............................................................................ 9

*Salazar v. National Basketball Association*,
    118 F.4th 533 (2d Cir. 2024) ..................................................................... 12, 15

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009) ............................................................. 11, 12, 13

*Seven County Infrastructure Coalition v. Eagle County*,
    145 S. Ct. 1497 (2025) ..................................................................................... 10

*Skidmore v. Swift Co.*,
    323 U.S. 134 (1944) ................................................................................... 10, 16

*Trull v. City of Lodi*,
    2024 WL 1344478 (E.D. Cal. 2024) ............................................................... 17

*U.S. Telecom Association v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ........................................................................... 9

*United States v. Paulson*,
    68 F.4th 528 (9th Cir. 2023) ............................................................................ 16

*VanderSloot v. Charles Baratta LLC*,
    2025 WL 1898929 (E.D.N.Y. 2025) ................................................................. 6

*Wijesinha v. Bluegreen Vacations Unlimited*,
    2019 WL 3409487 (S.D. Fla. 2019) ................................................................ 17

*Wilson v. Hard Eight Nutrition LLC*,
    2025 WL 1784815 (D. Or. 2025) .......................................................... 4, 5, 6, 10

*Wilson v. Skopos Financial, LLC*,
    2025 WL 2029274 (D. Or. 2025) ............................................................... 12, 15

*Winters v. Quicken Loans Inc.*,
    2020 WL 5292002 (D. Ariz. 2020) ................................................................. 17

**Statutes**

47 U.S.C. § 153 .................................................................................................. 7

47 U.S.C. § 227(a) ........................................................................ 3, 5, 11, 12, 14, 15

47 U.S.C. § 227(b) ........................................................................ 3, 6, 10, 13, 14, 15

47 U.S.C. § 227(c) ...................................... 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16

47 U.S.C. § 227(d) ............................................................................................. 15

47 U.S.C. § 332 .................................................................................................. 7

Do Not Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003) ............. 8, 10

Junk Fax Prevention Act of 2005, Pub. L. No. 109-21, 119 Stat. 359 (2005) ................. 5

Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66,
    107 Stat. 312 (1993) .................................................................................... 7

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) ................. 7

Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243,
    105 Stat. 2394 (1991) .......................................................................... 5, 14, 15

**Regulations and Administrative Materials**

16 C.F.R. § 310.4 ............................................................................................... 8

47 C.F.R. § 20.15 ............................................................................................ 7, 8

47 C.F.R. § 64.1200 ................................................................................ 1, 3, 13, 15

47 C.F.R. § 64.2305 ............................................................................................ 5

11 FCC Rcd. 15499 (1996) ................................................................................... 7

14 FCC Rcd. 15550 (1999) ................................................................................... 5

17 FCC Rcd. 17459 (2002) ................................................................................... 8

18 FCC Rcd. 14014 (2003) ..................................................................... 1, 3, 8, 10, 13

20 FCC Rcd. 3788 (2005) .................................................................................... 8

38 FCC Rcd. 12247 (2023) ........................................................................ 1, 8, 15, 16

59 Fed. Reg. 18493 (Apr. 19, 1994) ................................................................7, 8

68 Fed. Reg. 4580 (Jan. 29, 2003) ....................................................................8

88 Fed. Reg. 20800 (Apr. 7, 2023) ...................................................................15

**Rules**

Fed. R. Civ. P. 12(b) ...................................................................................2, 16

**Other Authorities**

*Black's Law Dictionary* (6th ed. 1990).........................................................4, 12

Daniel T. Deacon,
    *Administrative Forbearance*, 125 Yale L.J. 1548 (2016)..............................7

Oxford English Dictionary (2d ed. 1989) ....................................................12, 13

Paging Network, Inc., Annual Report (1991)...................................................14

Peter Kerr,
    *Cordless Phones Catching On*, N.Y. Times (Feb. 16, 1983),
    https://www.nytimes.com/1983/02/16/garden/cordless-phones-catching-on.html .......6

Webster's College Dictionary (9th ed. 1991) ..............................................3, 13

Webster's New Collegiate Dictionary (9th ed. 1991) .........................................12

# INTRODUCTION

The Telephone Consumer Protection Act's provisions authorizing a nationwide Do Not Call List empower the FCC to establish by regulation "a list of telephone numbers of residential subscribers who object to receiving telephone solicitations," 47 U.S.C. § 227(c)(3), and to prohibit telemarketers from "making or transmitting a telephone solicitation" to phone numbers on that list, § 227(c)(3)(F). For decades, the FCC has made those protections available to all residential phone subscribers, regardless of whether their phone numbers are associated with landline phones or cell phones. *See* 47 C.F.R. § 64.1200(c)(2), (e); 18 FCC Rcd. 14014, 14037–39 ¶¶ 33–36 (2003); *Chennette v. Porch.com*, 50 F.4th 1217, 1223 (9th Cir. 2022).[1] The FCC has also determined that it may prohibit unsolicited text messages, not just voice calls. *See* 47 C.F.R. § 64.1200(e); 18 FCC Rcd. 14115; 38 FCC Rcd. 12247, 12256–57 (2023).

Plaintiff Chet Michael Wilson is one of the hundreds of millions of Americans who rely on those protections. When Defendant Mountainside Fitness sent him telemarketing texts in willful violation of the FCC's rules, he sued to vindicate those rights.

Mountainside has now filed a motion to dismiss. It makes a big ask. The Supreme Court recently held that courts are not automatically bound by the FCC's interpretations, and should make their own assessment of what the TCPA means. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025). So Mountainside sees a chance to swing for the fences: It asks this Court to reject the FCC's longstanding interpretation and hold that the Do Not Call List protects only voice calls to old-school landline phones, potentially upending Do Not Call List protection for millions of Americans.

This court should decline that request. As other courts have recognized, a fresh read of the statutory text confirms that cell phone subscribers are eligible for Do Not Call List

---

[1] Business cell phones aren't eligible. *See Chennette*, 50 F.4th at 1223–26. But Mr. Wilson has alleged that the cell phone number he listed was for personal use, and Mountainside's Motion to Dismiss doesn't dispute that. So the only question here is whether the TCPA precludes protection for cell phone subscribers generally.

protection. They also may be protected from intrusive text messages, not just voice calls. Mountainside asks this Court to substitute its judgment for Congress's and the FCC's largely because in 1991 most "residential" phones were still landlines, and text messages didn't exist yet. But that is not how statutory interpretation works, and the plain meaning of the statute says otherwise. Moreover, later enactments and multiple express delegations of discretionary authority to the FCC confirm that Congress intends the FCC's consistent and longstanding judgment to control here.

More straightforwardly, Mr. Wilson has also alleged facts sufficient to support his claims for treble damages and injunctive relief. So, for the reasons explained below, Mountainside's motion to dismiss should be denied in its entirety.

## **FACTS**

Chet Michael Wilson has a personal cell phone he uses to communicate with friends and family, receive communications at home, and for other household tasks like scheduling appointments. Compl. (ECF 1) ¶¶ 10–15. He registered that residential cell phone number on the nationwide Do Not Call List, as the FCC permits. *Id.* ¶ 16.

Despite having no existing relationship with Mr. Wilson, and without his consent, Defendant Mountainside Fitness Acquisition intentionally sent Mr. Wilson multiple telemarketing text messages advertising fitness services. *Id.* ¶¶ 17–26. Mr. Wilson sued Mountainside under the TCPA and its implementing regulations, seeking damages and injunctive relief on behalf of himself and others who received similar unauthorized marketing messages from Mountainside.

## **LEGAL STANDARD**

On a Rule 12(b)(6) motion, a court accepts well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff to determine whether the complaint states a facially plausible claim for relief. *See, e.g.*, *Omar v. Arizona*, 2023 WL 2838036, at *1 (D. Ariz. 2023) (Liburdi, J.).

## ARGUMENT

**I.    The TCPA's Do Not Call List provisions protect cell phone subscribers.**

    ***A.    The text of § 227(c) establishes that cell phone subscribers are "residential telephone subscribers" eligible for Do Not Call List protection.***

    **1.** The TCPA's Do Not Call List provisions grant the FCC broad authority "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Unless otherwise defined, statutory text is given its "ordinary meaning" in the relevant context "at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019). As the FCC and courts have long recognized, the ordinary meaning of the Do Not Call List provision authorizes the FCC to protect cell phone subscribers. *See, e.g.*, *Chennette v. Porch.com*, 50 F.4th 1217, 1223–25 (9th Cir. 2022); 47 C.F.R. § 64.1200(e); 18 FCC Rcd. 14014, 14037–39 ¶¶ 33–36; *Cacho v. McCarthy & Kelly, LLP*, 739 F. Supp. 3d 195, 203 n.4 (S.D.N.Y. 2024) (collecting cases).

    Start with what the statute prohibits: unwanted "telephone solicitations." 47 U.S.C. § 227(c)(3). "Telephone solicitation" is a defined term. § 227(a)(4). In essence, it means "a telephone call or message" "which is transmitted to any person" for commercial purposes. *Id.*[2] Solicitations to cell phones fit that definition, which reflects no focus on any particular phone technology. First, to state the obvious, a cell phone is a "telephone." *See, e.g.*, 47 U.S.C. § 227(b)(1)(A)(iii) (using the phrase "cellular telephone"). The word "transmitted" also conveys no preference: "Transmit" means "to send a signal *by radio waves or by wire*." *Transmit*, Webster's College Dictionary (9th ed. 1991) (emphasis

---

[2] Here is the full definition: "The term 'telephone solicitation' means the initiation of *a telephone call or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, *which is transmitted to any person*, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization." 47 U.S.C. § 227(a)(4) (emphases added).

added). Nor does the word "message," which means "[a]ny notice, word, or communication, *no matter the mode and no matter how sent*, from one person to another." *Message*, *Black's Law Dictionary* (6th ed. 1990) (emphasis added). Finally, "any person" has a "naturally broad and inclusive meaning." *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 312 (1978).

Next, consider who is protected: "residential telephone subscribers" or, elsewhere, just "residential subscribers." 47 U.S.C. § 227(c)(1), (3). That phrase, too, conveys no technological limitation.

For starters, a person can be a "telephone subscriber" to any telephone service, either wired or wireless; a "subscriber" is anyone who pays for a service. *Cacho*, 739 F. Supp. 3d at 206–07; *Wilson v. Hard Eight Nutrition LLC*, 2025 WL 1784815, at *5 (D. Or. 2025).

That leaves the word "residential," which Mountainside's argument hinges on. That word doesn't exclude cell phone subscribers either. As used in the TCPA "residential" is just the opposite of "business." *See, e.g.*, *Isaacs v. USHealth Advisors, LLC*, 2025 WL 2268359, at *3 (N.D. Ga. 2025). It refers to the purposes for which a phone is used, not its physical characteristics or location. *See Hard Eight*, 2025 WL 1784815, at *5–6. So "residential subscriber" means a subscriber who uses their phone "for personal activities associated with his or her private, domestic life." *Cacho*, 739 F. Supp. 3d at 206.[3] Many cell phone subscribers, including Mr. Wilson, fit that description.

The TCPA's text and FCC regulations confirm that meaning of the word "residential." That's how "residential" is used in the TCPA's statutory findings, which contrast "business and residential customers." Pub. L. No. 102-243, § 2, 105 Stat. 2394,

---

[3] Many courts have recognized this meaning of the word "residential" in § 227(c). *See, e.g.*, *Isaacs*, 2025 WL 2268359, at *3; *Hard Eight*, 2025 WL 1784815, at *5; *Cacho*, 739 F. Supp. 3d at 206; *Lirones v. Leaf Home Water Sols., LLC*, 2024 WL 4198134, at *6 (N.D. Ohio 2024); *Jackson v. Direct Bldg. Supplies LLC*, 2024 WL 184449, at *5–7 (M.D. Pa. 2024).

2394 (1991).[4] The TCPA's text, as amended in 2005, also contrasts "residential subscriber" with "business subscriber." 47 U.S.C. § 227(a)(2)(A); *see* Junk Fax Prevention Act of 2005, Pub. L. No. 109-21, § 2, 119 Stat. 359, 360 (2005). And FCC regulations from the 1990s define "residential subscriber" as "a subscriber … that is not a business subscriber." 47 C.F.R. § 64.2305(d); *see* 14 FCC Rcd. 15550, 15692 (1999).

That meaning of "residential" also aligns with the "express aim" of the Do Not Call List: to protect residential subscribers' "'privacy rights.'" *Hard Eight*, 2025 WL 1784815, at *6 (quoting 47 U.S.C. § 227(c)(1), (2)). That shows that "Congress's interest in Section 227(c) was in the person and province that was being invaded and not simply in the technology through which the invasion was effected." *Cacho*, 739 F. Supp. 3d at 207. Those personal privacy interests "do not depend upon whether the undesired telephone solicitations are received on a cellular phone rather than a landline." *Lyman v. QuinStreet, Inc.*, 2024 WL 3406992, at *4 (N.D. Cal. 2024).

**2.** Mountainside counters that "residential telephone" must refer only to a landline phone that is physically "connected with" a house. MTD at 6. That's incorrect.

Mountainside relies on dictionary definitions, but those don't say what it claims. Mountainside says that "residential" means "of, relating to, or connected with" a residence, and that "residence" means, essentially, a "house" or "home." *See* MTD at 6. True enough. So "residential" means "related to home." But that definition doesn't, as Mountainside insists, require a *physical* connection. Simply "relating to" home in the more general sense is plenty. Here, "Congress used the term 'residential' in the broader sense of 'relating to a resident' to distinguish such a subscriber from a business or commercial telephone subscriber." *Cacho*, 739 F. Supp. 3d at 206.[5]

---

[4] Congress also found that telemarketing to "the home and other businesses" was widespread, and that automated and recorded calls "to businesses as well as to the home" needed to be curtailed. Pub. L. No. 102-243, § 2, 105 Stat. 2394, 2394 (1991).

[5] Mountainside also quotes (at 6–7) individuals saying "residential" or "home" in the legislative history. But "floor statements by individual legislators rank among the least illuminating forms of legislative history." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307

1    Nor does it matter that nearly all residential phones would have been landlines in

2    1991. *See* MTD at 6. "[I]t is ultimately the provisions of our laws rather than the principal

3    concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore*

4    *Servs., Inc.*, 523 U.S. 75, 79 (1998). It's the meaning of the words Congress used, not the

5    "particular manifestation of a problem" it had front of mind, that matters. *Nat'l Cable &*

6    *Telecom Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009). So even if nearly all

7    residential telephones were landlines in 1991, that doesn't mean the statute turns on

8    whether a physical wire is involved. *See Cacho*, 739 F. Supp. 3d at 205.[6]

9    **3.** Mountainside points out (at 5, 11) that the TCPA's restrictions on autodialer and

10   robocall technology in § 227(b) use the phrase "cellular telephone service," while § 227(c)

11   does not use that language. "The force of any negative implication, however, depends on

12   context." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013). Here, context refutes

13   Mountainside's negative inference, because § 227(b) has a "markedly different scope and

14   structure" than § 227(c). *Hard Eight*, 2025 WL 1784815, at *5; *VanderSloot v. Charles*

15   *Baratta LLC*, 2025 WL 1898929, at *4 (E.D.N.Y. 2025). Section 227(b) identifies

16   intrusive telemarketing practices based on the *technologies* involved, while § 227(c)

17   focuses on protecting identified *people* from unwanted solicitations. *See Isaacs*, 2025 WL

18   2268359, at *3. That's an obvious reason why "cellular telephones" would be expressly

19   mentioned in § 227(b), but not § 227(c).

20   **B.    *Subsequent congressional action confirms that reading of § 227(c).***

21   Between 1991 and 2003, Congress legislated several times to clarify the status of

22   cell phones, making clearer and clearer that it wanted them to be protected by § 227(c).

23

24

_____

25   (2017). And even the best legislative history yields to "the ordinary meaning and structure
     of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019).

26   [6] Even in 1991, an interpretation that hinged on the involvement of wires would have been
     strange. For example, cordless home phones were already in widespread use by then.

27   *See* Peter Kerr, *Cordless Phones Catching On*, N.Y. Times (Feb. 16, 1983),

28   https://www.nytimes.com/1983/02/16/garden/cordless-phones-catching-on.html.

1
2
3
4
5
6
7
8
9
10
11
12

    **1.** In 1993, Congress clarified that cell phone companies are presumptively "common carriers" for most purposes. *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 6002, 107 Stat. 312, 393 (1993) (enacting 47 U.S.C. § 332(c)(1)(A)). Ever since, uses of "common carrier" have meant both landline and cell phone companies, *unless* the FCC specifically determines otherwise. *See* 47 U.S.C. § 332(c)(1)(A); Daniel T. Deacon, *Administrative Forbearance*, 125 Yale L.J. 1548, 1568, 1574–75 (2016). Exercising that authority, the FCC has determined that uses of the term "common carrier" in the TCPA do refer to cell phone companies. *See* 47 C.F.R. § 20.15(a); 59 Fed. Reg. 18493, 18494–95 (Apr. 19, 1994). That matters because § 227(c) uses the phrase "common carrier" twice to identify the telephone companies whose "subscribers" would be protected by the Do Not Call List. *See* 47 U.S.C. § 227(c)(3)(B), (C).[7]

13
14
15
16
17
18
19
20

    **2.** In 1996, Congress updated the definition of "telephone exchange service." *See* Telecommunications Act of 1996, Pub. L. No. 104-104, § 3(a)(1)(B), 110 Stat. 56, 58 (1996). "Telephone exchange service" is also a defined term in the Telecommunications Act. *See* 47 U.S.C. § 153(54). And as with "common carrier," the TCPA uses "telephone exchange service" to describe companies whose "subscribers" are eligible for Do Not Call List protection. *See* 47 U.S.C. § 227(c)(3)(B), (C). The 1996 legislation clarified that this term, too, refers to both landline and cell phone service. *See* 11 FCC Rcd. 15499, 16000 ¶ 1014 (1996); *GTE Serv. Corp. v. FCC*, 224 F.3d 768, 769, 774–75 (D.C. Cir. 2000).[8]

21
22

    **3.** In March 2003, Congress passed the Do Not Call Implementation Act, which sent a clear signal that Congress understood § 227(c) to protect cell phone subscribers.

23
24
25
26
27
28

---

[7] For example, § 227(c)(3)(B) says that any FCC regulations must "require each *common carrier* providing telephone exchange service … to inform subscribers" that they may sign up for the national Do Not Call List (emphasis added).

[8] The definition of "telephone exchange service" is wordy and technical. *See* 47 U.S.C. § 153(54). But the way it covers cell phones is straightforward: A preexisting definition described traditional landline phone service. Congress retained the old language as part "A" of the definition, then added a new part "B" that expanded the definition to also refer to "comparable service." *See* Pub. L. No. 104-104, § 3(a)(1)(B), 110 Stat. 56, 58 (1996).

*See* Pub. L. No. 108-10, 117 Stat. 557 (2003). At the time, the FCC had started, but not yet finished, its rulemaking to establish a national Do Not Call List. *See* 17 FCC Rcd. 17459 (2002). Meanwhile, the Federal Trade Commission had recently finalized its own do-not-call regulations. *See* 68 Fed. Reg. 4580, 4671–72 (Jan. 29, 2003). Eager to get a national Do Not Call List up and running, Congress directed the FCC to complete its rulemaking, and, in "issuing such rule," to "maximize consistency with" a specific FTC regulation: "16 C.F.R. § 310.4(b)." Pub. L. No. 108-10, § 3, 117 Stat. 557, 557 (2003). That regulation granted do-not-call protection to any "telephone number," including cell phone numbers. *See* 16 C.F.R. § 310.4(b)(1)(iii)(B); 68 Fed. Reg. at 4672.[9]

**C.    *At the very least, Congress intended the FCC to decide this question.***

The FCC has permitted cell phone subscribers to register their numbers on the Do Not Call List from the start. Congress intended that reasonable judgment call to control.

**1.** When it first established the Do Not Call List regulations, the FCC determined that "wireless subscribers" were eligible for protection. 18 FCC Rcd. 14014, 14037 ¶ 33 (2003). Recognizing that "residential" refers to a phone's use, not its physical characteristics or location, the FCC rejected an argument similar to Mountainside's, finding that "wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones." *Id.* at 14038–39 ¶¶ 34–35; *Chennette*, 50 F.4th at 1227–28 (Bress, J., concurring). That position is consistent with other FCC decisions before and since. *See* 47 C.F.R. § 20.15(a); 59 Fed. Reg. 18493, 18494–95 (Apr. 19, 1994); 20 FCC Rcd. 3788, 3793 (2005); 38 FCC Rcd. 12247, 12256–57 (2023).

**2.** As explained, the FCC's position is the best reading of the statute's text. But if

---

[9] Notably, Congress must have known that the FCC would understand its directive to "maximize consistency with" the FTC as confirmation that § 227(c) covers cell phones. The FCC's notice of proposed rulemaking had previously flagged that it might interpret the term "residential telephone subscriber" in § 227(c) to include cell phone subscribers, and that doing so would harmonize with the FTC rule. 17 FCC Rcd. 17485 ¶ 44, 17491 ¶ 57. Congress cited that notice of proposed rulemaking in the Act's text. *See* Pub. L. No. 108-10, § 3, 117 Stat. 557, 557 (2003) (directing the FCC to complete "the rulemaking proceeding that it began on September 18, 2002").

the text leaves any doubt, it's because Congress expressly delegated authority to the FCC to decide. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024).

To be sure, mere ambiguity is no longer automatic cause to defer to an agency. *See Loper Bright*, 603 U.S. at 412–13 (overruling *Chevron*). But courts still defer when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id.* at 395. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.*; *see Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587–88 (6th Cir. 2025).

This case falls at the intersection of two such express delegations. First, § 227(c) itself is an express delegation of rulemaking discretion to the FCC: Congress tasked the FCC with evaluating alternative approaches based on (among other things) their "effectiveness in protecting … privacy rights" and their "other advantages and disadvantages," and with making rules "that *the Commission determines* are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(A), (E) (emphasis added). That language grants discretionary authority to "fill up the details," and "flexibility" to effectuate the TCPA's goals. *Loper Bright*, 603 U.S. at 395. Second, Congress in 1993 tasked the FCC with deciding whether cell phone companies are "common carriers" whose subscribers therefore have rights under the TCPA. *See supra* Part I.B.1. That expressly gives the FCC delegated "authority to give meaning to a particular statutory term." *Loper Bright*, 603 U.S. at 395. So if the statute itself doesn't resolve this question, Congress clearly wanted the FCC to answer it. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 718 (D.C. Cir. 2016) (express delegation was evidence that Congress expected telecommunications technology "to evolve and therefore charged the [FCC] with the continuing obligation to define it").

It therefore effectuates Congress's will here to "respect [that] delegation" and affirm the FCC's "reasoned decisionmaking" on this question. *Loper Bright*, 603 U.S. at

395. The FCC's decisionmaking here was, at the very least, "reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025). Recognizing as much, courts have continued to defer to the FCC's well-reasoned decision to allow registration of cell phone numbers, even after *Loper Bright* and *McLaughlin*.[10] This court should do the same.

**3.** In any event, the FCC's interpretation is, at the very least, an "informed judgment" that should be accorded "great weight." *Loper Bright*, 603 U.S. at 388 (citing *Skidmore v. Swift Co.*, 323 U.S. 134, 139–40 (1944)). The FCC's position is grounded in the agency's expertise, consistent across decades, and well-reasoned. Those are the hallmarks of agency action with "the power to persuade." *Id.*; *Skidmore*, 323 U.S. at 140.

**4.** Mountainside argues (at 8–9) that the FCC's rule is contrary to the text. It's not, for the reasons explained above. *See supra* Parts I.A–B.[11]

**5.** Mountainside also argues (at 15) that the FCC's rule is unenforceable because the TCPA directed the agency to "conclude the rulemaking" by 1992. That's not how regulatory deadlines work. Even when a statute commands action by a particular date, missing the deadline doesn't mean an agency loses power to act unless Congress specifies that consequence. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158–61 (2003).[12]

---

[10] *See, e.g.*, *Harriel v. Bealls, Inc.*, 2025 WL 2379617, at *2 (M.D. Fla. 2025); *Hard Eight*, 2025 WL 1784815, at *6–7; *Lirones*, 2024 WL 4198134, at *7; *Ferrell v. Colourpop Cosms., LLC*, 2025 U.S. Dist. LEXIS 140893, at *17–20 (C.D. Cal. 2025); *Lyman*, 2024 WL 3406992, at *4.

[11] In that part of its brief, Mountainside suggests (at 8) the FCC's order is flawed because "the FCC expressly relied on the autodialer provision of the TCPA contained within § 227(b)—not the DNC provision in § 227(c)." That mischaracterizes the FCC's order, which specifically interpreted "residential telephone subscribers" in § 227(c). 18 FCC Rcd. 14037–39 ¶¶ 33–36. The FCC used § 227(b) only to note (correctly) that the TCPA refers to cell phones elsewhere, so if Congress intended to exclude them from § 227(c), it likely would have said so "explicitly." 18 FCC Rcd. 14037–38 ¶¶ 33, 35 & n.131.

[12] And anyway, these regulations were timely enacted. Congress superseded the original deadline in 2003, in the Do Not Call Implementation Act. *See* Pub. L. No. 108-10, § 3, 117 Stat. 557, 557 (2003). That legislation set a new deadline, which the FCC met. *Compare id.* (September 2003 deadline), *with* 18 FCC Rcd. 14014 (released July 2003).

**II.    The text of § 225(c) authorizes suits for unwanted text messages.**

The TCPA authorizes recipients of unwanted "telephone solicitations" to sue for violations of the FCC's Do Not Call List rules. 47 U.S.C. § 227(c)(5). In relevant part, that private right of action says anyone may sue who "has received more than one telephone call within any 12-month period … in violation of the regulations." *Id.*

Mountainside contends that because the private right of action provision uses the word "call," and because the Do Not Call List provisions do not use the terms "text message" or "SMS message," Congress did not intend for the Do Not Call List protections to cover text messages. MTD at 13–15. It is unclear whether Mountainside is arguing that the FCC is prohibited from regulating texts to numbers on the Do Not Call List *at all*, or whether Mountainside is asserting that *only* the private right of action provision is limited to voice calls. *See* MTD at 13–14. Either way, Mountainside gets the statute wrong. The Do Not Call List provisions authorize the FCC to regulate "telephone solicitations," a defined term that plainly includes text messages. *See* 47 U.S.C. § 227(a)(4), (c)(1), (c)(3)(F). And the private right of action has the same scope as those other provisions.

**A.** Section 227(c) authorizes the FCC to prohibit unwanted telephone solicitations of all kinds, including text messages.

The core of § 227(c) is its prohibition on sending "telephone solicitations" to numbers on the Do Not Call List. 47 U.S.C. § 227(c)(1), (3)(F). The statute defines a "telephone solicitation" in relevant part to mean "the initiation of a telephone *call or message* … which is transmitted to any person." 47 U.S.C. § 227(a)(4) (emphasis added). That definition plainly encompasses modern text messages. As further explained below, the word "call" in the TCPA encompasses text messages. *See infra* Part II.B; *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) ("[W]e hold that a text message is a 'call' within the meaning of the TCPA."). That interpretation follows from "the ordinary, contemporary, and common meaning of the verb 'to call.'" *Satterfield*, 569 F.3d at 953–54 & n.3. And even if the word "call" weren't enough, contemporary dictionary definitions of the word "message" emphasized that it encompassed "[a]ny

1    notice, word, or communication, no matter the mode and no matter how sent." *Message*,

2    *Black's Law Dictionary* (6th ed. 1990).[13] So a "message" can be spoken *or* written. More

3    generally, the definition of "telephone solicitation" focuses not on a communication's

4    form but whether it has a commercial purpose. *See, e.g.*, *Hulce v. Zipongo Inc.*, 132 F.4th

5    493 (7th Cir. 2025). So Congress presumably referred to "call or message" disjunctively

6    in order to capture the broadest possible range of potential communication mediums. *See,*

7    *e.g.*, *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012).

8        Again, the purpose and structure of the Do Not Call List provisions support that

9    interpretation. Congress's stated goal was "to protect residential telephone subscribers'

10   privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C.

11   § 227(c)(1). And "a voice message or a text message are not distinguishable in terms of

12   being an invasion of privacy." *Satterfield*, 569 F.3d at 954; *see Wilson v. Skopos Fin.,*

13   *LLC*, 2025 WL 2029274, at *4 (D. Or. 2025).

14       To be sure, as Mountainside notes (at 13–14), Section 227(c) does not specifically

15   use the words "text messages" or "SMS messages." That is unsurprising, because the

16   TCPA was enacted in 1991, and the first-ever text message wasn't sent until 1992. *See*

17   *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015). But, as just

18   explained, the statute *does* explicitly cover any "telephone solicitation," which is broadly

19   defined to include any "call or message." 47 U.S.C. § 227(a)(4). That broad and inclusive

20   definition governs, not the specific facts or technology that Congress would have had in

21   mind in 1991. *See Oncale*, 523 U.S. at 79; *Nat'l Cable & Telecom Ass'n*, 567 F.3d at 665.

22   "The fact that a statute can be applied in situations not expressly anticipated by Congress

23   does not demonstrate ambiguity. It demonstrates breadth." *Salazar v. Nat'l Basketball*

24   *Ass'n*, 118 F.4th 533, 550 (2d Cir. 2024).

25       **B.**    Just as § 227(c)'s substantive provisions allow the FCC to regulate text

26

27   _____

     [13] *See also, e.g.*, *Message*, Webster's New Collegiate Dictionary (9th ed. 1991) ("a

28   communication in writing, in speech, by signals"); *Message*, Oxford English Dictionary
     (2d ed. 1989) ("an oral or written communication sent from one person to another").

1    messages, the private right of action in § 227(c)(5) authorizes suit when those rules are

2    violated. Section 227(c)(5) grants a private right of action to enforce the Do Not Call List

3    regulations to any "person who has received more than one telephone call within any 12-

4    month period … in violation of the regulations." 47 U.S.C. § 227(c)(5). That is "a

5    straightforward provision designed to achieve a straightforward result"—to enable "each

6    person to protect his own personal rights" under § 227(c). *Krakauer v. Dish Network,*

7    *LLC*, 925 F.3d 643, 650 (4th Cir. 2019).

8        Mountainside doesn't dispute that text messages can be sent "in violation of the

9    regulations." 47 U.S.C. § 227(c)(5). The FCC's regulations explicitly say so. *See* 47

10   C.F.R. § 64.1200(e). Mountainside nevertheless contends that Congress's use of the word

11   "call" in § 227(c)(5) limits private judicial remedies exclusively to *voice* calls that violate

12   the regulations. MTD at 13–14. That's incorrect.

13       It is well established that the word "call" in the TCPA includes text messages. As

14   the Ninth Circuit has explained, the "ordinary, contemporary, common meaning" of the

15   word "call" is simply "to communicate or try to get into communication with a person by

16   a telephone." *Satterfield*, 569 F.3d at 953–54 & n.3.[14] Accordingly, the FCC has

17   recognized since 2003 that when the TCPA says "call," it means not just traditional voice

18   calls but also modern text messages. 18 FCC Rcd. 14115 ¶ 165. And many courts have

19   reached the same conclusion.[15]

20       That meaning of "call" is especially clear in nearby provisions.

21       Notably, there is only one other reference to "calls" in § 227(c), and it has the same

22   breadth as "telephone solicitations." In § 227(c)(1)(D), Congress directed the FCC to

---

[14] *See also, e.g.*, *Call*, Webster's College Dictionary (1991) ("to communicate or try to communicate with by telephone"); *Call*, Oxford English Dictionary (2d ed. 1989) ("a summons or communication by telephone").

[15] *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Satterfield*, 569 F.3d at 954 (holding "that a text message is a 'call' within the TCPA"); *Dawson v. Porch.com*, 2024 WL 4765159, at *4 (W.D. Wash. 2024) (collecting cases).

assess whether it needed additional statutory authority "to further restrict telephone solicitations, including those *calls* exempted under subsection (a)(3)" (emphasis added). In the original TCPA, subsection (a)(3) contained the statutory definition of "telephone solicitation." *See* Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 3(a), 105 Stat. 2394, 2395 (1991). So § 227(c)(1)(D)'s reference to "calls exempted under" the definition of "telephone solicitation" presumably mirrored that definition—which, as explained above, broadly encompasses a "telephone call or message" and thus covers text messages even more clearly than the word "call" standing alone. 47 U.S.C. § 227(a)(4); *see supra* Part I.A.1.[16]

Similarly, § 227(b)(1)(A), an autodialer provision, uses the word "call" several times to describe a prohibited transmission to "a paging service." A typical paging device in the early 1990s would have displayed an incoming message as written text—usually displaying a phone number to call.[17] So those uses of the word "call" must have encompassed both voice and text transmissions, too.

Mountainside cites (at 14) *Jones v. Blackstone Medical Services, LLC*, 2025 WL 2042764 (C.D. Ill. 2025). But *Jones* is unpersuasive. There, the court decided that a text message could not be a "call" for purposes of § 227(c)(5)'s private right of action because "[t]ext messaging was not an available technology in 1991," and "in today's American parlance, 'telephone call' means something entirely different from 'text message.'" *Id.* at *4. But that is not the right way to interpret a statute. As the Supreme Court has cautioned—"modern intuition" doesn't always match "evidence of [a] term's meaning at

---

[16] Because § 227(c)(1)(D) confirms that the slight variation between Congress's use of a "call or message" in § 227(a)(4)'s capacious definition and its use of "call" in § 227(c)(5) is immaterial, the one district court that recently relied on this distinction to adopt a restrictive interpretation of § 227(c)(5) is unpersuasive. *See Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195, at *2 (N.D. Fla. 2025).

[17] *See, e.g.*, Paging Network, Inc., Annual Report, at 8 (1991), https://digital.library.mcgill.ca/images/hrcorpreports/pdfs/6/639549.pdf (noting that 92 percent of the company's pagers could "transmit a numeric message such as a telephone or account number to the subscriber").

the time of [a statute]'s adoption." *New Prime Inc.*, 586 U.S. at 114. When there's a mismatch, the original meaning of the text is what controls, not present-day usage. *See id.* at 114–16. So using the word "call" when one means "text" of course does sound odd to 2025 ears; unlike, say, the word "emoji," that meaning of the word "call" hasn't come to be part of the modern text messaging lexicon. But *Jones* and other cases go astray when they reflexively apply those present-day intuitions about how text messages are discussed to language from 1991, before the first text message was ever sent.[18]

Similarly, as explained above, it's irrelevant that Congress couldn't have text messages specifically in mind in 1991. *See supra* Part II.A (citing *Oncale*, 523 U.S. at 79; *Nat'l Cable & Telecom Ass'n*, 567 F.3d at 665; *Salazar*, 118 F.4th at 550). "The mere fact that Congress did not envision the ubiquitousness of text messaging in 1991 does not mean the FCC's conclusion lacks support." *Skopos Fin.*, 2025 WL 2029274, at *4.

*Jones* also disregarded the FCC's longstanding interpretation of "call" because the FCC, until 2023, had only articulated that interpretation in the context of the statute's autodialer prohibitions. 2025 WL 2042764, at *4–5. But that's unsurprising. The Do Not Call List provisions are built around the broadly defined term "telephone solicitation." 47 U.S.C. § 227(c)(1), (3). The standalone word "call" is more central to § 227(b)'s autodialer and robocall prohibitions, or in associated definitional provisions.[19] That's why the FCC first determined that "call" includes text messages in the § 227(b) context, and only more recently memorialized in a formal regulation that "call" has the same meaning in the Do Not Call List context. *See* 47 C.F.R. § 64.1200(e); 88 Fed. Reg. 20800, 20802 ¶ 6 (Apr. 7, 2023); 38 FCC Rcd. 12247, 12256–57 ¶ 26 (2023). But that doesn't mean there's any daylight between § 227(b) and § 227(c) on this question. And neither *Jones*

---

[18] *Compare, e.g.*, *Davis*, 2025 WL 2491195, at *1 (relying on how "a normal person refers to a text message"), *with* 47 U.S.C. § 227(b)(1)(A)(iii) (using the word "call" to refer to a message sent to a "paging service," the most analogous type of communication in 1991).

[19] *See* Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 3(a), 105 Stat. 2394, 2395–400 (using "call" or "calls" in the original text of 47 U.S.C. § 227(a)(1), (a)(3), (b)(1)(A), (b)(1)(B), (b)(2)(A), (b)(2)(B), (c)(1)(D), (c)(5), (d)(1)(A), (d)(3)).

nor Mountainside identifies any reason why there would be. *See United States v. Paulson*, 68 F.4th 528, 555 (9th Cir. 2023) (absent cause to think otherwise, "a word or phrase is presumed to bear the same meaning throughout a text").

To the contrary, reading the word "call" differently in § 227(c)(5) than in neighboring provisions would make no sense. *See, e.g.*, 38 FCC Rcd. 12257 (rejecting that "anomalous" interpretation). If Congress intended to cabin § 227(c)(5)'s private right of action to *exclude* text messages, it wouldn't have conveyed that by using a term that elsewhere in the statute *includes* them.

**C.** Even if the statute left room to doubt that a text message can be an actionable violation of the Do Not Call List provisions (which it doesn't), the FCC's longstanding interpretation of the word "call" should still carry the day. As previously explained, the FCC is regulating here with discretionary authority expressly delegated by Congress. *See supra* Part I.C. Acting under that express delegation, the FCC has reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier," "eliminate[s] any potential confusion in the industry," and aligns with both its determination that cell phone numbers are eligible for protection and the established meaning of the word "call" in other TCPA contexts. 38 FCC Rcd. 12256–57 ¶¶ 26–27.

Because the FCC acted reasonably and consistently in reaching that conclusion, this Court should affirm its "reasoned decisionmaking." *Loper Bright*, 603 U.S. at 395. Or, at a minimum, this court should look to the FCC's longstanding and consistent interpretation of the word "call" as an "informed judgment to which [it can] properly resort for guidance." *Id.* at 388 (citing *Skidmore*, 323 U.S. at 139–40).

**III. The Court should not dismiss Mr. Wilson's request for treble damages or his request for injunctive relief.**

Mountainside's final two arguments (at 16–17) challenge particular remedies that the complaint seeks: treble damages and injunctive relief. Both of those arguments fail because "courts in the Ninth Circuit—including this Court—tend to read Rule 12(b)(6) as applying only to claims, not to remedies." *Leo India Films Ltd. v. GoDaddy.com LLC*,

2023 WL 3740567, at *2 (D. Ariz. 2023); *see also, e.g.*, *Wijesinha v. Bluegreen Vacations Unlimited*, 2019 WL 3409487, at *8 (S.D. Fla. 2019).

Indeed, district courts routinely decline to dismiss requests for enhanced damages on a motion to dismiss. *See, e.g.*, *Gale v. Unifi Aviations, LLC*, 2025 WL 991100, at *3 (S.D. Cal. 2025); *Trull v. City of Lodi*, 2024 WL 1344478, at *8 (E.D. Cal. 2024) ("a motion to dismiss is not the proper vehicle to challenge a claim of damages," including treble damages); *cf. Winters v. Quicken Loans Inc.*, 2020 WL 5292002, at *4 (D. Ariz. 2020) (Liburdi, J.) ("[C]ourts in the Ninth Circuit have declined to dismiss separate causes of action for knowing or willful violations of the TCPA.").[20]

Alternatively, Mountainside's treble damages argument also fails on the merits. "[A]n allegation that 'defendant's conduct constituted multiple knowing and/or willful violations of the TCPA' [is] sufficient to withstand a motion to dismiss." *Winters*, 2020 WL 5292002, at *5 (Liburdi, J.) (quoting *Pacleb v. Cops Monitoring*, 2014 WL 3101426, at *4 (C.D. Cal. 2014)); *accord, e.g.*, *Keifer v. HOSOPO Corp.*, 2018 WL 5295011, at *5 (S.D. Cal. 2018). The complaint here alleges that Mountainside's actions were knowing and willful when it sent Mr. Wilson multiple telemarketing texts, despite the presence of his number on the national Do Not Call List and despite the fact that he never requested any information from them. Compl. ¶¶ 24, 26, 39. Those allegations are more than "sufficient to withstand a motion to dismiss." *Winters*, 2020 WL 5292002, at *5.[21]

## CONCLUSION

For these reasons, the Court should deny Mountainside's motion to dismiss.

---

[20] For similar reasons, courts have likewise declined to determine the appropriateness of injunctive relief on the pleadings. *See, e.g.*, *Wijesinha*, 2019 WL 3409487, at *8.

[21] At the very least, any dismissal should be without prejudice and with leave to replead. *See, e.g.*, *Physicians Surgery Ctr. of Chandler v. Cigna Healthcare Inc.*, 609 F. Supp. 3d 930, 941 (D. Ariz. 2022) (Liburdi, J.).

RESPECTFULLY SUBMITTED this 8th day of September, 2025,

Matthew W.H. Wessler
Michael Skocpol
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
Telephone: (202) 888-1741
michael@guptawessler.com

Anthony Paronich
PARONICH LAW PC
350 Lincoln St., Suite 2400
Hingham, MA 02043
Telephone: (508) 221-1510
anthony@paronichlaw.com


By:     /s/Michael Skocpol
          Michael Skocpol

*Counsel for Plaintiff and the Proposed Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2025, a true and correct copy of the foregoing opposition to defendant's motion to dismiss was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: September 8, 2025                    By:    /s/Michael Skocpol
                                                   Michael Skocpol