Ryan D. Watstein (*Pro Hac Vice pending*)
ryan@wtlaw.com
WATSTEIN TEREPKA LLP
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
TELEPHONE (404) 783-0695

John M. O'Neal (015945)
John.Oneal@quarles.com
Zachary S. Foster (*Pro Hac Vice*)
Zachary.Foster@quarles.com
John H. Contrera (039704)
Jack.Contrera@quarles.com
Quarles & Brady LLP
One Renaissance Square
Two North Central Avenue Suite 600
Phoenix, AZ 85004-2322
TELEPHONE (602) 229-5200

*Attorneys for Defendant*
*Mountainside Fitness Acquisition, LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Chet Michael Wilson, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Mountainside Fitness Acquisition, LLC,<br><br>Defendant. | NO. 2:25-cv-01481-MTL<br><br>**DEFENDANT MOUNTAINSIDE FITNESS ACQUISITION LLC'S MOTION TO DENY CLASS CERTIFICATION AND MEMORANDUM IN SUPPORT**<br><br>**(Oral Argument Requested)** |

## I.   **INTRODUCTION**

Plaintiff Chet Wilson and his lawyers are abusing the class action mechanism and the federal court system for personal profit, to the exclusion of any class. The Court should find them inadequate under Rule 23 and deny class certification now.

The scheme starts with the Heidarpour Law Firm ("HLF"), which does not file cases or appear in them. HLF signs up clients for all their TCPA claims in perpetuity, farms those claims to a rotating cast of litigation counsel—including counsel here—and counsel takes as much as a 95%+ contingency. The model rewards generating more claims and labeling them as class actions for settlement leverage, no matter how meritless or individualized.

Wilson signed onto this model in 2024. His agreement hands HLF a "power of attorney" to select, pursue, and settle his claims—including executing settlements and releases in his name without his knowledge. And if he tries to leave, it forces him to repay the firm for every outstanding claim. Wilson has no idea how many TCPA claims HLF is handling because he handed HLF his iCloud credentials and lets it demand, file, and settle claims without his involvement. A court in Wilson's home district recently held that advance settlement authority alone violates counsel's ethical obligations, *Slevin v. AB Hollywood, LLC*, --- F. Supp. 3d ----, 2026 WL 892186, at *12 (D. Or. Mar. 31, 2026).

The result? Nearly 100 TCPA class actions filed in Wilson's name, by a "fiduciary" who admits he does not know what "class certification" means, and not one class recovery. This case is the play run one more time. Mountainside texts only people who provide their numbers, but a customer typed his area code and Wilson's unique 999-9999 number into a membership form instead of his own. Wilson and his lawyers knew his claims were highly unique but nevertheless styled his lawsuit as a "class action" and served the class discovery that comes with it. In this manner, Wilson and his lawyers use one-off claims to leverage the *in terrorem* threat of Rule 23 to extract individual settlements many times the statutory maximum, with the lion's share flowing to counsel and HLF and nothing to the class. Those wielding Rule 23 this way are not fiduciaries and are therefore inadequate representatives. *See Wuest v. My Pillow, Inc.*, 2019 WL 3577176, at *3–4 (N.D. Cal. Aug. 6, 2019) (plaintiff

inadequate where ten prior cases showed he and his counsel used the threat of class litigation for an undeserved premium rather than any benefit to the class).

HLF's own authenticated business records now confirm that this arrangement is not unique to Wilson. HLF used materially identical agreements with numerous other serial TCPA litigants: an initial agreement covering all of their TCPA claims, followed by separate agreements governing individual claims and allocating fees among HLF and co-counsel. For the one serial litigant for which the undersigned (Watstein Terepka LLP) has complete records, eighteen "settlement statements" required the client to release all claims against her own counsel (including HLF and Plaintiff's counsel here) to receive payment. Taken together, the evidence points to one conclusion: HLF and its rotating counsel use serial TCPA litigants as pawns—deploying their names and numbers to generate claims against lawful businesses, invoking the threat of class litigation to extract settlements, and then obtaining sweeping releases from the clients to avoid accountability.

Mountainside need not prove more to prevail on this motion, but the record suggests something worse. Eight days after Wilson signed with HLF, a different kind of lead began appearing as the basis for some of his suits—one suggesting someone other than Wilson with a financial interest has been manufacturing claims using his number. The same pattern recurs across other HLF-controlled plaintiffs. Each time the undersigned has raised potentially manufactured claims, the cases were abandoned. This deepens the already fatal adequacy problem and saddles Wilson with unique defenses that defeat typicality too.

Wilson is also unfit for an independent reason: he publicly and violently threatens broad swaths of the people any class would include. He has repeatedly called Jewish people "parasites," boasted that he has "holes f***ing dug already" for them, threatened to "punch some motherf***ers in the head"—the parents of LGBTQ+ children—and directs the same violence and venom at Black Americans and women. A person who threatens violence against the people he is supposed to represent cannot be their fiduciary. Nor can a person who then lies about it under oath, as Wilson recently did.

The actions of Wilson's counsel complete the picture. When another defendant moved to deny certification in a similar Wilson case based on his abuse of Rule 23, counsel immediately moved to dismiss Wilson's own case with prejudice. Counsel blamed Wilson's racist rhetoric, yet they are still prosecuting this case and other Wilson cases. When the defendant subpoenaed HLF to obtain documents and information relevant to its motion, HLF hired the former Acting U.S. Solicitor General to move to quash. This pattern is consistent in other cases too. When the undersigned served a subpoena on HLF in another case, they immediately dismissed it with prejudice. When the undersigned raised potential litigation fraud by HLF, they dismissed those cases too.

Rule 23(a)(4) and 23(g) exist to keep absent class members out of hands like these. None of this turns on Mountainside's documents, and no amount of discovery will change what Wilson and his counsel are doing. The Court should deny class certification now.

## II.    BACKGROUND: WILSON AND HIS LAWYERS HAVE WEAPONIZED RULE 23 FOR PERSONAL PROFIT

### A.    Mountainside texts only people who give it their numbers.

Mountainside operates fitness clubs. Mountainside Decl. ¶ 2. It doesn't cold-text strangers—it texts only people who provide their phone numbers in connection with membership or an inquiry. *Id.* ¶¶ 3-4. That consent precludes a TCPA claim. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).

And that's what happened here. In July 2023, a family of new members—apparent Oregon transplants—signed up for a family account. Mountainside Decl. ¶ 5 & Ex. A. Seemingly not wanting to provide a real number, one family member provided his area code followed by 999-9999. *Id.* at ¶ 6 & Ex. B. That's Wilson's number.[1]

After the member provided Wilson's number, Mountainside sent a handful of texts, which invited the recipient to respond "STOP" if they no longer wanted to receive such

---

[1] Obviously, 999-9999 is a magnet for errant calls. That's why Wilson traded a car for the number and turned down an offer to sell it for $20,000. Watstein Decl., Ex. D (Wilson Dep.) at 47:6–9. Knowing that, he posts the number publicly on social media and invites people to contact him on it. Watstein Decl., ¶¶ 37–38, Ex. L (Dec. 19, 2025 Post).

messages. *Id.* ¶ 7. Had Wilson done that in response to the first message, he would not have received any further messages and would not have a TCPA claim. 47 U.S.C. § 227(c)(5) (requiring "more than one" call in 12 months for a claim to arise). Despite knowing the texts were intended for someone else, Wilson did not respond STOP. *Id.* ¶ 8.

So, even on Wilson's own story, this is not a case about a company that buys lists, blasts strangers, and ignores the do-not-call registry. It's a case about a law-abiding business that texted a number its own customer gave it and would have immediately stopped texting if the recipient had replied with four simple letters. Wilson and his lawyers understand that. They filed this case as a class action anyway, ostensibly on behalf of all persons Mountainside texted with numbers on the national do-not-call (DNC) registry who didn't consent. *See generally* Compl., ECF No. 1.

**B.      Wilson signed himself over to the Heidarpour Law Firm, run by a family with a history of schemes.**

Wilson signed up with HLF on October 4, 2024, under an agreement unlike any ordinary engagement letter. Watstein Decl. ¶ 70, Ex. P[2] (2024 CFA).

*Start with its scope*: Wilson didn't retain HLF for a claim, or even a set of claims, but rather "for any and all claims regarding [the] Telephone Consumer Protection Act"— every TCPA claim he had or might ever have, in perpetuity. Ex. P (2024 CFA) § 1. *Next, its powers*: The agreement gives HLF "power of attorney" to select, pursue, and settle Wilson's claims and to "execute all claims, contracts, settlements, checks, drafts, compromises, covenants, releases, verifications, dismissals and deposits" for him. *Id.* § 7. *Finally, its exit penalty*: Though styled a "contingent" fee agreement, Wilson must reimburse HLF for all expenses on every outstanding claim, likely hundreds, if he terminates. *Id.* § 9. And even assuming Wilson could afford to leave, the agreement additionally gives HLF a period of "30 days to settle or relinquish any claims that are in negotiation status" *after* Wilson terminates. *Id.*

---

[2] All references to Exhibit numbers are to the exhibits attached to the Declaration of Ryan D. Watstein ("Watstein Decl.").

HLF itself does not file cases or make an appearance.[3] Watstein Decl. ¶ 40, 51 & Ex. N (Heidarpour Decl.) ¶ 4. Instead, it refers Wilson's claims to a cast of litigation counsel and takes 30% of everything those lawyers recover. Watstein Decl. ¶¶ 74–75 & Ex. Q (Aug. 29, 2025 Contingent Fee Agreement, or "2025 CFA," ¶ 5, allocating 30% to HLF); *id.* ¶ 77. Despite holding an interest in every case, HLF is disclosed in almost none of the certificates of interested persons filed in those cases. Watstein Decl. ¶ 42 & Ex. B.

HLF didn't stop with the 2024 CFA. As discovery in the *Wilson v. Freeway* case shows, there is allegedly a second, case-specific agreement Wilson supposedly signs on top of the 2024 Agreement. *See generally* Ex. Q (2025 CFA). That agreement caps Wilson's own recovery at his statutory damages and assigns every dollar above that cap to the lawyers. *Id.* §§ 5, 7. The TCPA does not shift fees, so Wilson's counsel engineered their own fee-shifting: they file a one-off claim as a "class action," extract a settlement far beyond what the statute allows, and keep most of it under the 2025 CFA. Watstein Decl. ¶¶ 4–5. This scheme pays counsel more under a statute Congress wrote without fee-shifting than they could earn under actual fee-shifting statutes, all with no fee petition, no lodestar, and no court ever reviewing the number. *Compare* 47 U.S.C. 227(c), *with, e.g.*, 42 U.S.C. § 1988 *and* 15 U.S.C. § 1692k(a)(3) (both allowing "reasonable" fee approved by court).

Wilson's testimony shows how completely he handed control to HLF. He gave law-firm personnel his iCloud credentials so HLF's "tech guy" could "stay on top of it." Watstein Decl., Ex. D (Wilson Dep.) at 68:17–20. He could not say which lawyers his claims were referred to, on what terms, or who accesses his accounts on the firm's behalf. *Id* at 12:13–13:17. Given that Wilson's primary contact at HLF appears to be a female, it looks to be Farideh Heidarpour, Andrew Heidarpour's mother. *Id.* at 68:17–69:4; Watstein Decl. ¶¶ 50–54 & Ex. N (Heidarpour Decl.). That she now appears to run Wilson's intake is fitting, because the family has been running similar schemes for years.

---

[3] While not appearing as counsel despite Local Rule 83.3(a), Heidarpour served Plaintiff's discovery responses and signed as "Attorney for Plaintiff." Watstein Decl. ¶ 43 & Ex. M (Discovery Resps.).

Initially, it was healthcare fraud: Ms. Heidarpour served prison time for fraudulent medical billing, and she and Andrew Heidarpour's brother agreed to pay nearly $1.7 million to resolve an accompanying False Claims Act case. Watstein Decl. ¶ 44–47.

The family then pivoted to TCPA litigation. First came Abante Rooter & Plumbing, a purported plumbing company run by Fred Heidarpour (Farideh Heidarpour's husband), whose real business was filing TCPA suits. *Id.* ¶¶ 48–49. It acquired more than 20 phone lines and filed 70-plus class actions in the Northern District of California alone. *Abante Rooter & Plumbing, Inc. v. Signify Health*, 2024 WL 1421279, at *1 (N.D. Cal. Apr. 2, 2024); Watstein Decl. ¶ 49.[4] As one court observed, "virtually all of them" resulted in "individual settlements, before any class certification motion has been brought." *Id.* That ended only when courts took notice and defendants showed that some claims appeared to be manufactured. *See Abante Rooter & Plumbing, Inc. v. Long Fence & Home, LLLP*, No. 3:23-cv-6496-RS (N.D. Cal.), Dkt. Nos. 22, 28 (dismissing with prejudice following motion explaining defendant didn't place the calls or even do business in state). When that dried up, the operation evolved into its current form, run through HLF and figureheads like Wilson with indicia of fraud, as explained below.

### C. Nearly 100 class actions have been filed in Wilson's name, but no class member has recovered a dime.

Since contracting with HLF, Wilson has become the named plaintiff in nearly 100 TCPA class actions, with likely hundreds more threatened in pre-suit demands. Watstein Decl. ¶¶ 6–7, 41, 57 & Ex. B. Every case that has settled has done so individually—70% of all Wilson cases—with absent class members receiving nothing to date. *Id.* ¶ 6, 8 & Ex. B. Wilson calls the operation "a line of steady income." Wilson Dep. at 73:22. But despite

---

[4] Abante's stated place of business was an apartment, with the lobby locked mid-day and no signage for a licensed business anywhere in sight. *See* Joe Dworetzky, *Serial Filer of Class Action Suits Against Telemarketers Draws Attention of District Judge*, Local News Matters (Apr. 8, 2024), https://localnewsmatters.org/2024/04/08/serial-filer-of-class-action-suits-against-tele-marketers-draws-attention-of-us-magistrate/.

asking to serve as a class representative nearly 100 times, he testified, "I don't know what the class certified [*sic*], I don't know what that means." Wilson Dep. at 61:10–11.

As of late last year, Wilson had recovered at least $50,000 for himself across the entire enterprise, but that figure has likely ballooned past $150,000, with his lawyers recovering millions. Wilson Dep. 7:19–8:5; Watstein Decl., ¶¶ 4–6 & Ex. B. And that's just in Wilson's cases, which are a fraction of the cases originated by HLF and filed by appearing counsel here. *See* Watstein Decl. ¶¶ 78–84 & Exs. R–U (outlining settlements received for another TCPA litigant with an identical contingent fee agreement as Wilson's and showing an average recovery around 90% counsel and 10% client).

**D.  Wilson publicly threatens the people his classes would include—and when exposed, he lied about it under oath.**

In addition to using litigation to enrich himself, Wilson also publicly and routinely threatens violence against people who would be members of any class he would represent.

He has stated that he has "holes fu\*\*ing dug already" for Jewish people, who he calls "parasites" and "Bolshevik fu\*\*ing jews." Watstein Decl. ¶¶ 17–18, 20 & Ex. E. As to parents of transgender children, he threatened to "punch some motherf\*\*\*ers in the head." *Id.* ¶¶ 29–30 & Ex. I. He told Black Americans to "get the f\*\*\* up and go get a job," insisted "I don't owe you sh\*t," and sneered that but for slavery they would be "in a mud hut chucking spears in the brush." *Id.* ¶¶ 27–28 & Ex. H. He bragged that his own genetic results showed not "a f\*\*n trace of knuckle dragger" in his bloodline. *Id.* ¶ 24–26, Ex. G.

Wilson then lied about it. In his declaration filed in the *Wilson v. Freeway* case, Wilson swore he had never threatened anyone, and that his commentary was meant to be private. Watstein Decl. ¶ 36 & Ex. K (Wilson Decl.) ¶¶ 28–29. But sixteen days before he signed that declaration, Wilson praised Adolf Hitler, announced "we're gonna find them all," and declared that "we need to finish what f\*\*\*in' Hitler was tryin' to do." *Id.* ¶ 34. A week later, he mocked a Jewish man living in Tel Aviv, telling him: "Stay there f@g-hat beak nose POS. Needed to ship the rest of you back… To the bottom of the ocean." *Id.* ¶ 85. His posts were never private and were always threatening, as an independent third

party, Facebook—which Wilson calls "f*ggbook"—concluded when it removed Wilson's posts more than a dozen times for "incitement to violence," "hate speech," "bullying," and "harassment." *Id.* ¶¶ 21–23 & Ex. F (Feb. 17, 2026 Post).

   **E.    Eight days after Wilson signed with HLF, questionable leads started appearing.**

   But class action abuse, violent hate speech, and dishonesty aren't the only problems with Wilson and his counsel's claims. Some of them suggest litigation fraud too. After Farideh Heidarpour's fraud conviction and after Abante Rooter drew scrutiny, the family shifted to a different structure: recruit outside plaintiffs; manufacture claims or ignore that the plaintiffs have done so; refer them to litigation counsel who may not know their provenance; and ask not to be disclosed. Watstein Decl. ¶¶ 40, 42, 55–57. This has played out in thousands of cases across the country, at enormous cost to the courts. And across this operation, there is strong evidence of lead forms submitted by someone with a financial interest—sometimes even shown by IP evidence tracing to the plaintiff's own town of a few thousand people. *Id.* ¶ 56. Confronted with such evidence, outside counsel has routinely been forced to abandon HLF-originated cases, but only after imposing enormous expense to try and extract a settlement. *See Johnson v. Medigap Life*, No. 22-cv-81427 (S.D. Fla.), Dkt. Nos. 34, 44 (dismissing after defendant submitted evidence of fraud).

   Wilson's cases follow the same pattern. As this case shows, his unique number genuinely attracts misdirected contacts. Mountainside Decl. ¶ 6; Watstein Decl. ¶ 59. But as in other HLF-originated serial plaintiff claims that start legitimately, some of the leads associated with Wilson's number generated after Wilson signed up with HLF bear the hallmarks of someone attempting to generate new claims. This includes: (1) a lead form submitted using Wilson's number immediately after he signed with HLF which included an identity and email address belonging to no one; (2) Wilson's number being opted out of a company's system only to have it resubmitted, which allowed Wilson to plead around another pending case with "opt out" claims; (3) Wilson's number being used to opt into a

stock alert service, whose only function is sending timely alerts, and thus for which there would be no reason to provide a wrong number. Watstein Decl. ¶¶ 60–63.

This pattern is not unique to Wilson. The undersigned recently defended cases brought by another HLF-originated serial plaintiff, Sara Taylor, referred to the same outside counsel group. *Id.* ¶ 58. After connecting with HLF, Taylor became the named plaintiff in 25 TCPA class actions in rapid succession—after her number was submitted to dozens of companies through hundreds of lead forms designed to appear as coming from a felon living 100 miles away with a similar number. *Id.* When counsel exposed suspected litigation fraud, the cases were dismissed immediately and without payment, and the litigant who had filed 25 back-to-back cases never filed another. *Taylor v. LaserAway*, No. 25-cv-02157 (C.D. Cal.), ECF Nos. 16, 20; *Taylor v. Milan Laser Corp.*, No. 25-cv-00018, ECF No. 31 (M.D. Ga. June 30, 2025). Nor is Taylor a distant example: she and Wilson have served as co-plaintiffs in the same case, represented by the same counsel here. *Taylor & Wilson v. Savvy Ins. Sols., LLC*, No. 1:25-cv-12393 (D. Mass. 2025). That is not a coincidence of two mistyped numbers. It is what you would expect from an operation that generates claims in bulk and assigns them to the various perpetual clients in its roster.[5]

More recently, an even more direct example of litigation fraud surfaced. In another Wilson action prosecuted by the same counsel here, the defendant's SMS vendor confirmed that its internal platform records tied the January 1, 2025 opt-in for Wilson's number to a single IP address. Watstein Decl. ¶ 64 & Ex. W at p. 30 (Birch Decl.), ¶¶ 2–7. Wilson himself was forced to admit in response to an RFA that this exact IP address was assigned to him on January 30, 2025. *Id.*, Ex. W at p. 3 (Shechter Decl.), ¶ 4. In other words,

---

[5] Other defendants have reached the same conclusion. In *Woodard v. Health Insurance Alliance LLC*, No. 1:23-cv-02630 (N.D. Ill.), the court sustained fraud counterclaims, holding the plaintiff was alleged to have "actively solicited calls . . . for the purpose of manufacturing TCPA claims." Dkt. No. 46, at 8 (Feb. 26, 2025). The defendant then subpoenaed HLF as "notorious for manufacturing TCPA claims," and the case was dismissed with prejudice after two years. Def.'s Resp. to Mot. to Quash at 2, *In re Subpoena to Heidarpour Law Firm, PLLC*, No. 1:25-mc-21698 (S.D. Fla. May 19, 2025), Dkt. No. 12; *Woodard*, Dkt. Nos. 59–60 (May 15–16, 2025).

someone with access to Wilson's internet connection submitted the very lead on which Wilson's case was based.

### F.    When another defendant outed the scheme, Wilson unsuccessfully tried to dismiss his own case, and HLF moved to quash.

On May 17, 2026, another defendant, Freeway Insurance Services, filed a motion to deny class certification in a similar Wilson case and subpoenaed HLF. *Wilson v. Freeway Ins. Svcs.*, No. 6:25-cv-1869 (D. Or. May 16, 2026), Dkt. No. 19. Wilson's counsel immediately tried to dismiss with prejudice. Watstein Decl. ¶¶ 10–11. Counsel said Wilson's racist rhetoric precipitated dismissal yet continued prosecuting other Wilson cases where the defendant had not challenged their sue-and-settle scheme. *Id.* ¶¶ 11–12.

The Court did not permit that maneuver. Rather than allow Wilson to dismiss his way out from under the motion, Chief Judge McShane ordered Wilson to respond to Freeway's motion on the merits. *Wilson v. Freeway*, Dkt. No. 30 (July 14, 2026). He then took oversight of all fourteen of Wilson's TCPA actions still pending in the District, pausing each of them pending resolution of Freeway's certification motion. *Id.*

HLF followed a similar tactic in its response to Freeway's subpoena. It produced 14 cherry-picked pages, redacted the financial terms without any stated basis, and stamped the documents "highly confidential" with no protective order. Watstein Decl. ¶ 67. The tiny production raised more questions than it answered: the 2024 CFA carried a complete verification log, but the 2025 CFA carried only a bare DocuSign number, with no record that Wilson opened, viewed, or signed anything. Watstein Decl. ¶¶ 70, 74, 76 & Exs. P, Q. This and other evidence suggests that HLF signed under its power of attorney. *See id.* ¶¶ 72, 76–77, 83 & Exs. S, T. HLF rejected Freeway's offer to pause the subpoena in exchange for an explanation of this, retained a former Acting U.S. Solicitor General, and moved to quash. Watstein Decl. ¶¶ 66, 77–78, Exs. O, R. That collateral proceeding remains pending.

## III.    <u>LEGAL STANDARD</u>

Rule 23 imposes a demanding burden that Plaintiff cannot carry. He must prove that "(1) the class is so numerous that joinder of all class members is impracticable; (2) there

are questions of law or fact common to the class; (3) [his] claims or defenses . . . are typical of the claims or defenses of the class; and (4) [he and his counsel] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

This motion turns mostly on the fourth requirement, adequacy, which asks two questions: whether "the named plaintiffs and their counsel have any conflicts of interest with other class members," and whether they will "prosecute the action vigorously on behalf of the class[.]" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023). Counsel is independently scrutinized under Rule 23(g). Counsel with conflicts, undisclosed financial entanglements, or integrity problems cannot be appointed class counsel. Fed. R. Civ. P. 23(g)(4); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009) (fee arrangements bear on adequacy); *Jimenez v. Domino's Pizza, Inc.,* 238 F.R.D. 241, 248 (C.D. Cal. 2006) ("attorneys' ethics" is "relevant" to "determining [] adequacy").

Plaintiff "must actually prove—not simply plead—that [his] proposed class satisfies each requirement of Rule 23," *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024), and he must do so "by a preponderance of actual evidence." *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249, 1258 (9th Cir. 2024). Under Rule 23(c)(1)(A), Plaintiff must do this at "[a]t an early practicable time after" suing "as a class representative[.]" And defendants may file a "'preemptive' motion to deny certification." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939 (9th Cir. 2009). If it does, the burden remains with Plaintiff. *Victorino v. FCA US LLC*, 322 F.R.D. 403, 405 (S.D. Cal. 2017).

## I.      ARGUMENT

### A.      Wilson cannot represent a class for three independent reasons.

#### 1.      Wilson's sue-and-settle model creates an irreconcilable conflict with absent class members.

A class representative stands in the shoes of absent class members and acts on their behalf. The minimum requirement is confidence that the representative and his counsel will protect the class's interests rather than put their own first. *Kim*, 87 F.4th at 1000. A plaintiff is inadequate where his litigation history shows that he and his counsel use the threat of

class litigation to obtain an undeserved premium on the plaintiff's individual claim rather than any benefit for the class. That is exactly what the court held in *Wuest v. My Pillow*.

The plaintiff in *Wuest* settled ten of his eleven prior putative class actions before certification. 2019 WL 3577176, at *3. The court found him inadequate because his history "show[ed] a pattern of using the threat of class actions to extract an undeserved premium on an individual claim[,]" *id.*, and because his lawyers collected outsized fees under a statute that "makes no provisions for any attorney's fees" while "no significant benefit was ever conferred on the general public [or] a large class of persons." *Id.* at *4. "The premium was something rightfully due to the 'class,' but no absent putative class member ever got anything. Wuest and his counsel got it all." *Id.*

If just over ten filings evidenced abuse in *Wuest*, Wilson's nearly 100 in two years— almost ten times as many, without a single contested certification pursued—present a far more compelling case. Watstein Decl. ¶ 6–7, 9, Ex. B. Wilson publicly calls the operation "a line of steady income"—for himself, not for any class. Wilson Dep. at 73:21–22.

As the Ninth Circuit has put it, "a plaintiff [who] appends class claims to increase leverage for an individual settlement . . . make[s] the plaintiff an inadequate class representative, and a motion for denial of class certification [is] in order." *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1409 (9th Cir. 1989); *see also, e.g.*, *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574, 577–79 (W.D.N.C. 2000) (plaintiff inadequate where "pattern" of settling handful of putative class actions individually "belie[d]" interest in the class); *Backus v. ConAgra Foods, Inc.*, 2016 WL 7406505, at *5–6 (N.D. Cal. Dec. 22, 2016) (similar); *Yaffe v. Detroit Steel Corp.*, 50 F.R.D. 481, 483 (N.D. Ill. 1970) (similar).

That is exactly the case here. Wilson's lawyers devised the same workaround pursued in *Wuest*: style small, individualized claims as class actions, recycle burdensome discovery, and "extract a premium deal far in excess of the value of [an] individual case." *Wuest*, 2019 WL 3577176, at *4. Wilson has done that nearly 100 times. A litigant who abuses Rule 23 for his own benefit should not be put in charge of protecting a class.

### 2.  Wilson is a figurehead who cannot monitor, direct, or discharge the lawyers who run his cases.

Adequacy also requires a representative capable of doing the job: supervising counsel and making litigation decisions for the class. Wilson has contracted that role away. HLF holds a power of attorney to select, pursue, settle, release, and deposit the proceeds of "any and all" of his TCPA claims, forever. 2024 CFA § 1; *see also* 2025 CFA § 1. He provided firm personnel his iCloud credentials. Wilson Dep. 68:17–19. He doesn't know who his claims were referred to or on what terms. *Id.* at 12:17–13:14. And he cannot leave HLF: terminating would obligate him to repay its costs across every outstanding matter. 2024 CFA § 9. A representative in that position cannot check counsel's conflicts, veto a self-interested settlement, or fire his lawyers—the core functions Rule 23(a)(4) assigns him. The arrangement enables counsel to run the case for their own gain.

That remains true even if, as in *Freeway*, a subsequent, case-specific agreement supplies the operative financial terms here, since the 2024 CFA gives control over all cases—including likely hundreds of pre-suit claims—and the cost-repayment penalty runs across every outstanding matter. 2024 CFA §§ 1, 9. A client economically beholden to one firm across hundreds of matters can't serve as a check on that firm in any single matter.

And a case-specific CFA similar to the Freeway case[6] would make the control problem worse. It caps Wilson's recovery at his statutory damages and assigns every dollar above that cap to the lawyers. *Id.* That incentivizes counsel to do what they've done with respect to Wilson in other cases: remove him from the case strategy entirely. *Freeway* is a clear example, where Wilson allegedly rejected an offer five times his statutory damages but then dismissed for nothing. Pl.'s Reply ISO Mot. to Dismiss at 8 n.2, *Wilson v. Freeway*, Dkt. No. 26. No client chooses nothing later over max statutory damages now, proving these agreements stripped Wilson of his right and will to monitor counsel.

---

[6] Wilson has refused to produce various information relevant to this motion, despite HLF producing similar information in other matters: the engagement agreements governing this case, the settlement statements releasing his claims against counsel, the amount of money he and his counsel have made from individual settlements, and so on. Mountainside continues to confer with Wilson about this and will likely move to compel.

A clause merely obligating the plaintiff to "follow the recommendation of [his] attorney" on settlement was enough to defeat adequacy in *In re Ocean Bank*, 2007 WL 1063042, at *4–6 (N.D. Ill. Apr. 9, 2007); *accord Rogers v. Khatra Petro, Inc.*, 2010 WL 3894100, at *8 (N.D. Ind. Sept. 29, 2010). Wilson's 2024 agreement goes further than any decision on record, authorizing counsel to settle, release, and dismiss in his name, and threatening him with ruinous cost-repayment if he tries to leave.

### 3.    His violent public rhetoric independently disqualifies him, and so does his dishonesty about it.

Wilson's own violent threats separately disqualify him from serving as a fiduciary. He has publicly referred to Jewish people as "parasites" and stated that he has "holes fu\*\*ing dug already" for them. Watstein Decl. ¶¶ 17–18, 20 & Ex. E. He has threatened to "punch some motherf\*\*\*ers in the head"—the parents of transgender children—and directs the same hatred at Black Americans, the broader LGBTQ+ community, and women. *Id*. ¶¶ 21–30. Rule 23(a)(4) requires confidence that a representative will fairly protect *all* absent class members, *Kim*, 87 F.4th at 1000, not just those he happens not to despise. Any class certified here will include the people Wilson threatens violence against. A person who directs violence at groups of people cannot be their fiduciary.

Nor can someone who then lies about it. When Wilson finally addressed this conduct under oath, he claimed that he has "never threatened or intended to incite violence." *Id.* ¶ 36 & Ex. K (Wilson Decl.) ¶ 29. Sixteen days earlier, however, he had urged his followers to "finish what f\*\*\*in' Hitler was tryin' to do" and told the world, "Whatever I say is what I believe." *Id*. ¶¶ 34–35. And a mere week before signing his declaration, he told a Jewish man living in Tel Aviv to "[s]tay there f@g-hat beak nose POS. Needed to ship the rest of you back… To the bottom of the ocean." *Id*. ¶ 85. A plaintiff who gives "intentionally false and misleading testimony in an effort to further his interests in [the] litigation" cannot be trusted to protect absent class members. *Kaplan v. Pomerantz*, 132 F.R.D. 504, 509–10 (N.D. Ill. 1990) (decertifying class); *accord Friedman-Katz v. Lindt & Sprungli (USA), Inc*., 270 F.R.D. 150, 160–61 (S.D.N.Y. 2010)

(plaintiff's "willingness … to give intentionally false testimony" barred her from representing class members).

In sum, the evidence shows that Wilson only cares about himself, and the contractual terms his lawyer imposed only make that worse. If anyone is inadequate to be a fiduciary of a class, it is Wilson.

### B. Plaintiff's counsel cannot adequately represent a class either.

Courts also deny certification where counsel's conduct creates serious doubt about their loyalty or integrity. *May v. Gladstone*, 562 F. Supp. 3d 709, 713–14 (C.D. Cal. 2021); *see also Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) ("When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class."). The record here compels the conclusion that counsel is inadequate too.

A class representative and his counsel must put the class's interests ahead of their own, *Kim*, 87 F.4th at 1000, and counsel's history here demonstrates that they have done the opposite. Across more than 50 examples, counsel's *modus operandi* is to use the threat of class litigation to obtain a premium over what the statute permits rather than litigate for the class. Watstein Decl. ¶¶ 4–6, 8. They have set up their engagement agreements to enable that outcome, and they have carried it out in every Wilson case to date.

Every dismissed Wilson case (75% of all his filed cases to date) has resolved individually, with no class certified and no absent class members receiving anything. Watstein Decl. ¶¶ 6–9, Ex. B. That record answers the question Rule 23(g)(1)(A) asks of counsel seeking appointment here—whether they will litigate for a class. HLF-appointed counsel have had nearly a hundred opportunities and haven't done so once.

As to the agreements, the 2024 CFA hands HLF power of attorney over "any and all" claims. 2024 CFA § 1. The 2025 CFA caps Wilson's recovery at his statutory damages and assigns every dollar above that cap to the lawyers. 2025 CFA §§ 5–7. This pays counsel more under a statute Congress wrote *without* fee-shifting than they could earn under statutes that provide for it—with no fee petition and no court reviewing the lodestar to

justify it. Courts examine fee terms like these at certification precisely because of what they show about loyalty. *Rodriguez*, 563 F.3d at 959; *In re Amla Litig.*, 320 F.R.D. 120, 122 (S.D.N.Y. 2017). The test is "whether, at the time a fee sharing agreement is reached, class counsel are placed in a position that might endanger the fair representation of their clients[.]" *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 224(2d Cir. 1987).

That counsel puts its interests before the class is confirmed by their response to scrutiny: in *Freeway*, they moved to dismiss their own client's case with prejudice for nothing, and HLF retained an AmLaw 10 white-collar defense team to move to quash its subpoena.[7] Watstein Decl. ¶¶ 11, 66, 77. They have also dismissed numerous *other* cases for *other* plaintiffs against the undersigned's clients—including some with prejudice—in response to the Freeway motion and the subpoenas served on HLF. *Id.* ¶¶ 13–14.

Nor is Wilson's arrangement unique. HLF's records concerning another serial TCPA claimant—the only complete set of records the undersigned has been able to obtain given HLF's pending motion to quash and Wilson's refusal to respond to discovery—show the same structure and more: an initial agreement granting HLF authority over all her TCPA claims, followed by claim-specific agreements and then "settlement statements." The agreements cap the claimant's recovery at statutory damages and award any excess to counsel. And each "Settlement Statement," in turn, requires the claimant, as a condition of receiving her share, to release HLF and co-counsel—including counsel here—from "ANY AND ALL" claims of every kind. Watstein Decl. ¶¶ 78–84 & Exs. R–U. These records confirm the conflicts embedded in Wilson's agreements reflect HLF's recurring model.

Counsel's response to scrutiny reinforces the same conclusion. Besides dismissing Plaintiff's *Freeway* claims to protect their practice, they took a power of attorney and paired it with a repayment penalty that makes discharge financially impossible. 2024 CFA §§ 1, 7, 9. A federal court has already held that advance blanket settlement authority alone

---

[7] Although Wilson's counsel in this case (Mr. Paronich) has not officially appeared in the Freeway case, he is actively involved in the case and listed in the Freeway Co-Counsel Agreement as counsel, with an entitlement to 60% of the fees recovered. 2025 CFA ¶ 5.

"violates the Oregon Rules of Professional Conduct." *Slevin*, 2026 WL 892186, at \*12. Arizona is no different. *See* Ariz. R. Sup. Ct. 42, ER 1.2, 1.8(g); *In re a Member of the State Bar of Ariz.*, 2006 WL 6162014, at \*9 (Ariz. Disp. Comm'n Dec. 22, 2006). Section IV.A.3 *supra* addresses what those terms do to *Wilson*—they leave him unable to supervise anyone. A related point here applies to *counsel*: lawyers who use an agreement stripping their own client of the right to manage or settle his case or fire them cannot be expected to put unnamed class members first, and thus cannot be fiduciaries for them.

### B.    Wilson's one-off claims render him atypical.

Wilson's unique circumstances also render him atypical. A representative's claims must be "typical of the claims . . . of the class," Fed. R. Civ. P. 23(a)(3), and thus "a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508–09 (9th Cir. 1992) (affirming denial of certification because the plaintiff's litigation history and unique reliance problems guaranteed his testimony would become "a major focus" of the trial).

That danger is not hypothetical here. Any class trial would center on Wilson: his 100 cases, arrangement with HLF, and 999-9999 number, potentially fraudulent leads in his name, and his abhorrent posts and videos and attempts to lie about them. This baggage would consume all the oxygen in the courtroom and steal the attention of the jury, risking prejudice to absent class members. That renders him an atypical (and inappropriate) class representative. *See Hudson-Bryant v. OCMBC, Inc.,* 2026 WL 1507407, at \*5 (C.D. Cal. May 27, 2026) (denying certification in TCPA class action on typicality because "defenses unique to Plaintiff threaten to become the focus of this litigation, creating dangers for absent class members."). Rule 23(a)(3) exists to keep a class trial from becoming a trial about the representative. That is the only trial this case could produce.

### V.    <u>CONCLUSION</u>

This Court should deny certification now and permit this case to proceed only as it always was: one individual's one-off claim about accidental texts to a 999-9999 number.

RESPECTFULLY SUBMITTED this 4th day of August, 2026.

WATSTEIN TEREPKA LLP
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309

By: */s/ Ryan D. Watstein*
Ryan D. Watstein (*Pro Hac Vice*
Application Submitted)

QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue Suite 600
Phoenix, AZ 85004-2322

By: */s/ John M. O'Neal*
John M. O'Neal (015945)
John.Oneal@quarles.com
Zachary S. Foster (*Pro Hac Vice*)
Zachary.Foster@quarles.com
John H. Contrera (039704)
Jack.Contrera@quarles.com
*Attorneys for Defendant Mountainside
Fitness Acquisition, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2026, I caused a true and correct copy of the foregoing document to be filed with the Clerk of the Court through the U.S. District Court Electronic Court Filing System, which caused notice of such filing to be sent electronically to the registered attorneys of record.

*/s/ Jennifer Fortner*
John M. O'Neal

- 19 -