Ryan D. Watstein (*Pro Hac Vice*)
ryan@wtlaw.com
WATSTEIN TEREPKA LLP
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
TELEPHONE (404) 783-0695

John M. O'Neal (015945)
John.Oneal@quarles.com
Zachary S. Foster (*Pro Hac Vice*)
Zachary.Foster@quarlescom
John H. Contrera (039704)
Jack.Contrera@quarles.com
Quarles & Brady LLP
One Renaissance Square
Two North Central Avenue Suite 600
Phoenix, AZ 85004-2322
TELEPHONE (602) 229-5200

*Attorneys for Defendant*
*Mountainside Fitness Acquisition, LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Chet Michael Wilson, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Mountainside Fitness Acquisition, LLC,<br><br>Defendant. | NO. 2:25-cv-01481-MTL<br><br>**DECLARATION OF RYAN D. WATSTEIN IN SUPPORT OF DEFENDANT MOUNTAINSIDE FITNESS ACQUISITION, LLC'S MOTION TO DENY CLASS CERTIFICATION** |

1. My name is Ryan D. Watstein. I am an attorney and co-founder of Watstein Terepka LLP, an approximately 25-lawyer firm based at 75 14th Street NE, Suite 2600, Atlanta, Georgia 30309. I am over the age of 18, of sound mind, and competent to make this Declaration. I make this Declaration based on my personal knowledge.

2. I am counsel of record for Defendant Mountainside Fitness Acquisition, LLC ("Mountainside") in this action and the related *Wilson v. Freeway* case discussed below. Based on my active participation and supervision of all material aspects of the defense of that matter, I have personal knowledge of the matters set forth herein.

3. I have defended more than 600 TCPA class actions in 30+ jurisdictions across the country as lead counsel. My firm and I also prosecute select class actions for plaintiffs.

4. Based on that extensive experience, I know that, in the case of an individual settlement, plaintiff's counsel generally takes the vast majority of the recovery—often more than 90% and in some cases more than 99%. By definition, nothing goes to any class member in any such settlement.

5. Individual settlements in cases styled as TCPA "class actions" average $50,000 or more each, depending on who the plaintiff's counsel is and a variety of other factors. It is not uncommon to see individual TCPA settlements over $100,000 and some cases settle individually for many multiples of that. In almost all instances, individual settlements are vastly in excess of the maximum statutory damages. This is what is known as the "extortion premium."

**Plaintiff's Litigation History**

6. Since October 2024, Plaintiff Chet Wilson has been a named plaintiff in 83[1] putative TCPA class actions. As of today, Plaintiff has settled or dismissed 62 of those

---

[1] The PACER Case Locator results include three additional docket entries for cases already counted above because they were transferred or filed in duplicate, but omit one case filed in the Southern District of Texas. The results thus return 85 docket entries for the 83 cases identified above. *Compare* Exhibit A *with* Exhibit B.

cases on an individual basis. A true and correct copy of the PACER Case Locator search results for Chet Wilson is attached hereto as **Exhibit A**.

7. Attached hereto as **Exhibit B** is a true and correct copy of the Table of Cases Filed by Chet Wilson, which our team prepared based on our review of publicly available federal court dockets.

8. As reflected in the Table of Cases and the PACER search results, most of Plaintiff's cases settled individually within months, sometimes weeks, after being filed, before the end of the discovery period, and apparently often before discovery opened, given the timing.

9. Based on my review of the dockets identified in Exhibits A and B, I have not identified any case in which Plaintiff litigated a contested motion for class certification to a ruling. The only case I am aware of in which Wilson has sought certification is *Wilson v. PacifiCorp*, where the parties jointly seek certification solely for settlement purposes. Attached hereto as **Exhibit C** is a true and correct copy of the Proposed Class Action Settlement Agreement filed by the parties in *Wilson v. PacifiCorp*, No. 6:24-cv-1956 (D. Or. June 9, 2026), Dkt. No. 47-1. That proposed settlement amplifies the adequacy issues explained in Mountainside's motion to deny class certification for the reasons explained in *Wilson v. Freeway Ins. Services of Am., LLC*, No. 6:25-cv-1869 (D. Or.) ("*Wilson v. Freeway*") at Dkt. No. 32, pp. 3, 17-18.

10. Fourteen[2] of those dismissals or settlements occurred after May 16, 2026, when Freeway Insurance Services of America, LLC ("Freeway"), a defendant represented by the undersigned counsel in a TCPA class action brought by Plaintiff, filed a similar motion to deny class certification in *Wilson v. Freeway*:

---

[2] Although a fifteenth case, *Wilson v. Better Mortgage Corp.* was also dismissed during this period, it appears that the parties initially sought a stipulated dismissal of that case on February 24, 2026, but that repeated filing deficiencies delayed formal dismissal until June 30, 2026. No. 1:25-cv-5503 (S.D.N.Y.), Dkt. Nos. 40, 41, 42.

(i)  *Wilson v. Staples, Inc.*, No. 1:26-cv-11489 (D. Mass.): on May 19, 2026, the defendant filed a motion for extension of time to file its answer pending settlement (Dkt. No. 8), and Plaintiff subsequently filed a Notice of Voluntary Dismissal (Dkt. No. 10).

(ii)  *Wilson v. Mortg. One, Inc.*, No. 3:25-cv-03648 (S.D. Cal.): Plaintiff filed a Notice of Voluntary Dismissal on May 20, 2026 (Dkt. No. 16), despite having recently defended his claims against a Rule 12(b)(6) motion (Dkt. Nos. 11, 12, 13).

(iii)  *Wilson v. Dealmed Med. Supplies, LLC*, No. 1:26-cv-9 (E.D.N.Y.): Plaintiff filed a Notice of Voluntary Dismissal on May 20, 2026 (Dkt. No. 22), despite having recently defended his claims against a Rule 12(b)(6) motion (Dkt. Nos. 15, 18).

(iv)  *Wilson v. Yakima Valley Farm Workers Clinic,* No. 1:26-cv-3003 (E.D. Wash.): Plaintiff filed a Stipulation of Dismissal with Prejudice on May 22, 2026 (Dkt. No. 15).

(v)  *Wilson v. AMS Moving Inc.*, No. 9:26-cv-80334 (S.D. Fla.): Plaintiff filed a Notice of Settlement on May 26, 2026 (Dkt. No. 10) and a Notice of Voluntary Dismissal on July 15, 2026 (Dkt. No. 14).

(vi)  *Wilson v. Easy Spirit, LLC*, No. 3:25-cv-112 (D. Conn.): Plaintiff filed a Stipulation of Dismissal with Prejudice on May 26, 2026 (Dkt. No. 99).

(vii)  *Wilson v. Vozzcom, Inc.*, No. 0:25-cv-61793 (S.D. Fla.): Plaintiff filed a Notice of Settlement on June 12, 2026 (Dkt. No. 43) and a Stipulation of Dismissal with Prejudice on July 12, 2026 (Dkt. No. 45).

(viii)  *Wilson v. Hard Eight Nutrition LLC*, No. 6:25-cv-144 (D. Or.): Plaintiff filed a Stipulation of Dismissal on June 30, 2026 (Doc. 31).

(ix)  *Wilson v. Cirkul Inc.*, No. 6:25-cv-2036 (D. Or.): Plaintiff filed a Notice of Voluntary Dismissal on July 9, 2026 (Dkt. No. 35), despite having recently received a favorable Report & Recommendation (Dkt. No. 29) on a contested motion to dismiss for which Plaintiff filed *several* notices of supplemental

authorities, and having responded to the defendant's objections to that R&R (Dkt. Nos. 20, 24, 25, 26, 27, 34).

(x) *Wilson v. Monarch Recovery Mgmt., Inc.*, No. 2:25-cv-4845 (E.D. Pa.): Plaintiff filed a Stipulation of Dismissal with Prejudice on July 13, 2026 (Dkt. No. 11).

(xi) *McGonigle & Wilson v. MRS BPO LLC*, No. 1:25-cv-15811 (D.N.J.): Plaintiff Wilson filed a stipulation of dismissal without prejudice of his claims only on July 14, 2026 (Dkt. No. 42).

(xii) *Wilson v. Nat'l General Ins. Co.*, No. 1:25-cv-719 (M.D.N.C.): Plaintiff filed a stipulation of dismissal on July 15, 2026 (Dkt. No. 23).

(xiii) *Wilson v. Lifestation, Inc.*, No. 1:25-cv-07426 (S.D.N.Y.): Plaintiff filed a notice of settlement on July 21, 2026, and the court dismissed the case on July 23, 2026 (Dkt. Nos. 39, 40).

(xiv) *Wilson v. Gen. Audit Corp.*, No. 3:26-cv-207 (N.D. Ohio): the court entered an order after the parties represented that they had reached a resolution of the case, directing the parties to file a notice of dismissal within 14 days (Minute Order July 22, 2026).

11. In fact, hours after learning that Freeway's motion to deny certification would be filed, Wilson moved to dismiss his own case with prejudice. His counsel said the dismissal was precipitated by Wilson's racist rhetoric.

12. But Wilson's counsel did not immediately dismiss each of Wilson's other class actions, including this one. Nor would counsel agree that Wilson is an inadequate representative.

13. Since Freeway filed its motion to deny certification in *Wilson v. Freeway*, Plaintiff's counsel Andrew Perrong and/or Anthony Paronich have dismissed 7 cases where Watstein Terepka represents the defendants. Many dismissals or requests to stipulate to a dismissal occurred within hours of Judge McShane's Scheduling Order, ECF No. 30. *See, e.g.*, *Weingrad v. Business Capital LLC*, No. 2:25-cv-6344 (E.D. Pa. July 14, 2026) (filing

- 4 -

a notice of voluntary dismissal despite recently traveling to argue against a pending motion to dismiss), Dkt. No. 28; *Weingrad v. Denny's, Inc.*, No. 3:26-cv-342 (D. Or. July 15, 2026), Dkt. No. 17; *Weingrad v. Fund Mate LLC*, No. 2:24-cv-4716 (E.D. Pa. July 15, 2026), Dkt. No. 45; *Bronstin v. S. Cal. Edison Co.*, No. 8:25-cv-2334 (C.D. Cal. June 18, 2026), Dkt. No. 35; *Nelson v. Cap. Vision Eye Servs.*, No. 5:26-cv-10275 (E.D. Mich. June 29, 2026), Dkt. No. 19; *Soboleski v. TerrAscend Corp.*, No. 4:25-cv-11763 (E.D. Mich. July 14, 2026), Dkt. No. 34; *Nelson v. OmahaSteaks.com, LLC*, No. 3:26-cv-10481 (E.D. Mich. July 20, 2026), Dkt. No. 13.

14.     In dismissing some of these cases, Plaintiff's counsel alluded to the Seventh Circuit's recent decision in *Steidinger v. Blackstone Medical Services*, --- F.4th ----, 2026 WL 2028517 (7th Cir. July 14, 2026), holding that text messages do not qualify as "calls" under the TCPA. But none of the dismissed actions was pending within the Seventh Circuit, and some involved phone calls, not text messages. And Plaintiff's counsel has continued litigating materially similar text-message claims outside the Seventh Circuit against defendants represented by other firms. *See, e.g.*, Proposed Case Management Plan, *Shelton v. JR Cap., LLC*, No. 2:26-cv-2878 (E.D. Pa. July 17, 2026), Dkt. No. 16. In many of these cases, counsel had previously tendered individual settlement demands for many multiples of the available statutory damages, sometimes nearing six figures.

15.     Since Freeway filed its motion to deny certification in *Wilson v. Freeway*, HLF and its referral counsel have also begun transmitting draft class-action complaints to prospective defendants, paired with individual settlement demands of approximately $100,000. Across hundreds of cases against these firms, I do not recall ever seeing a similar practice before Freeway filed its motion.

16.     Attached hereto as **Exhibit D** is a true and correct copy of the deposition transcript of Chet Michael Wilson, taken on December 12, 2025, in *Wilson v. Skopos Financial, LLC*, No. 6:25-cv-376 (D. Or.).

**Plaintiff's Public Statements**

17. On or about May 6, 2026, Plaintiff published a public video on Facebook captioned "Got some holes need filled boys & I need to know who's with me on this one."

18. In that video, Plaintiff made violent antisemitic statements, including referring to Jewish people as "parasites," calling them "Bolshevik fu\*\*ing jews," and stating that he has "holes fu\*\*ing dug already" for them.

19. The video was previously available on Facebook, but after I told Andrew Perrong, Plaintiff's counsel of record in *Wilson v. Freeway*, that we would be including it in the motion filed in that action, it was removed from Facebook. A screen recording of the video is available for viewing at the following address:[3] https://www.dropbox.com/scl/fi/ckch1qrs1le3ya4p9t2zz/Wilson-Threads-Video-2026-05-06-Cut.mov?rlkey=gn7u246aqvgjgb7achja4fhso&st=r3k21hll&dl=0.

20. Attached hereto as **Exhibit E** is a true and correct copy of a screenshot of that post.

21. Plaintiff has had posts removed from Facebook on more than a dozen occasions for "incitement to violence," "hate speech," "bullying," and "harassment." That is according to his own Instagram post, which shows the removed posts and that he has been suspended from Facebook for that reason.

22. He refers to Facebook derisively as "f\*ggbook"—a homophobic slur—and has bragged publicly about being removed from the platform.

23. Attached hereto as **Exhibit F** is a true and correct copy of relevant Instagram posts reflecting these statements.

24. In a separate public Instagram post discussing his genetic ancestry results, Plaintiff bragged about not having "a fkn trace of knuckle dragger" in his genetic results.

25. Attached hereto as **Exhibit G** is a true and correct copy of that post.

[3] For privacy reasons, the first 30 seconds of the original video have been omitted because they depict Wilson's minor children sleeping. No other portion of the video has been omitted or altered.

26. According to a Google search I conducted, that term is a racist epithet used to evoke simian imagery against Black individuals.

27. That's not the worst of it. Talking about reparations to families of former slaves, Wilson said this on October 30, 2025:

> So all you motherf***ers can suck a d*ck. F*** you mother***ers. Whining about how we owe you some f***ing sh*t . . . . F*** you dude. You lazy piece of sh*t. Get the f*** up and go get a job . . . . You were a slave before you got sold off. Your own f***ing people sold you off. How the f*** do I owe you sh*t? You mother f***ers didn't pick a Goddamn nothing off my f***ing trees. F*** you. I don't owe you sh*t. I don't owe you motherf***in sh*t. If anything, we gave you something better dude. You'd f***ing be named W*ngT*ng f***ing something in the f***ing, in a mud hut chucking spears in the brush motherf***er . . . . There ain't no white privilege. If anything, it's black privilege . . . . I ain't slaving my life away to feed you f***ing knuckle-dragging piece of sh*t. F*** you.

28. Attached hereto as **Exhibit H** is a true and correct copy of that post. The video is also available for viewing at the following address:

https://www.dropbox.com/scl/fi/clcjs4itz6n19m7ncfhw1/Wilson-Threads-Video-2025-10-30.mov?rlkey=ltn1h3lm0ghz51rcm7wmc94j1&st=ryegwvzl&dl=0.

29. His vitriol and violent rhetoric also extend to the LGBTQ+ community. Speaking to parents of transgender people on October 23, 2025, he stated "I would love to punch some motherfuckers in the head. I would love it. But I'm smart. I ain't gonna f***ing do stupid shit with witnesses. But, the time will come."

30. Attached hereto as **Exhibit I** is a true and correct copy of that post. The video was available at https://www.instagram.com/p/DQKQERdDyvI/?hl=en, but it is no longer publicly accessible as of August 3, 2026.

31. Plaintiff also publicly operates and promotes a group devoted to helping people "circumvent[] taxation" and avoid what he characterizes as enslavement by the federal government.

32. Attached hereto as **Exhibit J** is a true and correct copy of a post reflecting those statements.

- 7 -

33.    Even after May 16, 2026, when Freeway filed the motion to deny class certification in *Wilson v. Freeway*, Wilson made his Instagram page private, but he continued to post videos on the Threads platform. He began referring to Jewish people as "Juice" and with a "juice box" emoji. A screen recording of one such social media post, uploaded by Plaintiff on the social media platform Threads on June 17, 2026, is available for viewing at the following address:

https://www.dropbox.com/scl/fi/sdynl2c7qnbfn1tbq106b/Wilson-Threads-Video-2026-06-17-Juice.mov?rlkey=fy4rwri9eenrba77dtjyflm4r&st=69614cu4&dl=0.

34.    On June 27, 2026, Plaintiff posted a video on the social media platform Threads, with a caption that read, "Was Hi Tler wrong to stand for what he believed was right? From my deep research, he seems to be the greatest protector of Christianity I've found in the last 500 years." In the video itself, Plaintiff stated as follows:

> So no matter how much blackmailin' and fuckin corrupting and fucking influencing with greed Israel has on our country, they're done. Those motherfuckers are exposed. Those fuckin' parasites are known to the world now. They can't hide under the fuckin' rock. These fuckin' weasel piece of shits can't fuckin' hide anymore. We're gonna find them all. And I think we need to finish what fuckin' Hitler was tryin' to do.

A screen recording of that Threads post is available for viewing at the following address:

https://www.dropbox.com/scl/fi/85ff1nzqhl7wry0l60un0/Wilson-Threads-Video-2026-06-27-Hitler-Video.mov?rlkey=v4p58sn8qqcdk5zvwt8iy3w34&st=ds5qny9o&dl=0.

35.    On May 28, 2026, Plaintiff posted another video on the social media platform Threads, in which he stated that he "almost lost out on . . . a couple hundred thousand dollars this year" for "speaking the truth and being outspoken and not bending or wavering or silencing my voice." He also said that he "put his foot down" and said, "Whatever I say is what I believe." He further stated, "When I have something to say, it's gonna be said," and "there's no carrot you can dangle in front of my face that's gonna make me quiet down

or, or, or quiet my voice." A screen recording of that Threads post is available for viewing at the following address:

https://www.dropbox.com/scl/fi/cbkkjw0ven7p6scwmf0qi/Wilson-Threads-Video-2026-05-28.mov?rlkey=2ume8vl5jwxshnyyw7lru9czy&st=g87sn297&dl=0.

36.     In *Wilson v. Freeway*, Wilson filed a declaration in which he swore that the statements he posted online "were intended to be private and not publicly accessible," and that he has "never threatened or intended to incite violence." A true and correct copy of that declaration is attached hereto as **Exhibit K**.

37.     Wilson posts his 999-9999 number online, including on social media, and invites people to contact him on it.

38.     Attached hereto as **Exhibit L** is a true and correct copy of an Instagram post reflecting an example of such a statement.

**The Heidarpour Law Firm's Role in Plaintiff's Litigation**

39.     The Heidarpour Law Firm, PLLC ("HLF") is a law firm based in the District of Columbia. HLF's principal is Andrew Heidarpour.

40.     Based on my firm's experience in dozens of Wilson cases and demand letters, HLF plays a recurring behind-the-scenes role in originating and profiting from Plaintiff's TCPA lawsuits, even when other attorneys appear as counsel of record.

41.     My firm has received demand letters from HLF threatening Wilson TCPA claims against approximately one dozen of my clients that have not yet resulted in filed lawsuits.

42.     Despite HLF's financial interest in the outcome of Wilson's cases, it has almost never been disclosed as an interested entity in the Certificates of Interested Persons filed in those cases, or in similar certificates in cases in other districts. *See, e.g.*, *Kotlarsz v. Platinum Choice Healthcare LLC*, No. 9:24-cv-80835, ECF No. 4 (S.D. Fla. July 9, 2024) (failing to disclose Heidarpour as an interested party, despite the fact that he originated the case); *Lyman v. Quinstreet*, No. 23-5056, ECF No. 3 (N.D. Cal. Oct. 3, 2023) (same); *see also* Exhibit B.

- 9 -

43. And even though HLF has not appeared as counsel of record in this action, Andrew Heidarpour served Plaintiff's discovery responses and signed them as "Attorney for Plaintiff." Attached hereto as **Exhibit M** is a true and correct copy of Plaintiff's Responses to Mountainside's Interrogatories.

**Background on HLF and Family's Litigation Practice**

44. Public records show that Farideh Heidarpour, an employee of HLF and the mother of Andrew Heidarpour, pleaded guilty in the Western District of Oklahoma to healthcare fraud. *See United States v. Heidarpour*, Case No. CR-11-109-M, ECF No. 146 (W.D. Okla. Aug. 14, 2012).

45. She admitted to executing a scheme that defrauded multiple federal agencies by willfully and intentionally billing for medical services that were never performed. *Id.*

46. She was sentenced to over a year in federal prison and was prohibited from participating in any provider that bills federal health benefit programs. *Id.,* ECF No. 194.

47. Farideh Heidarpour and an alleged co-conspirator, also a member of the Heidarpour family, paid nearly $1.7 million to resolve an accompanying False Claims Act civil case. *See United States ex rel. Lammers v. Heidarpour*, No. 3:08-cv-03411-WHA (N.D. Cal.); *see also* Press Release, U.S. Att'ys Off., N.D. Cal.*, United States Settles False Claims Act Allegations Against Billing Manager* (Aug. 28, 2013), https://www.justice.gov/usao-ndca/pr/united-states-settles-false-claims-act-allegations-against-billing-manager.

48. After or around the time of Farideh Heidarpour's release from prison, the family entered the TCPA litigation business.

49. Fred Heidarpour—Andrew's father—converted Abante Rooter & Plumbing, Inc., a family-owned plumbing company, into what functioned as a TCPA claim mill. According to public federal court filings, Abante Rooter acquired over 20 telephone lines and filed more than 70 putative TCPA class actions in the Northern District of California alone, represented by the same plaintiff's counsel in each case. *See Abante Rooter v. Signify Health,* 2024 WL 1421279 (N.D. Cal. Apr. 2, 2024).

50.    As mentioned above, Farideh Heidarpour now works at HLF and, according to public reviews, appears to carry out much of the work of generating TCPA lawsuits associated with HLF.

51.    Even Andrew Heidarpour's own declaration, submitted in support of HLF's motion to quash a subpoena filed as an ancillary proceeding in the District Court for the District of Columbia, admits that "HLF is a small firm," that "currently employs one other attorney and limited support staff," and that he has "asked [his] mother, Farideh Heidarpour, to perform non-legal secretarial duties, such as answering telephone calls." Decl. of Andrew Heidarpour ¶ 2, *In re Subpoena to Heidarpour Law Firm, PLLC*, No. 1:26-mc-99-RJL-ZMF (June 24, 2026), Dkt. No. 1-1. A true and correct copy of Andrew Heidarpour's declaration is attached hereto as **Exhibit N.**

52.    As demonstrated by the screenshots of Google reviews below, Ms. Heidarpour assists potential clients with their cases:



53.    Neither Mr. Heidarpour's website nor any other site located to date identifies any other assistant, secretary, or intake coordinator besides Ms. Heidarpour, or any other female employee.

54. Google reviews discuss additional conversations with a female employee, as has Wilson, that, given the lack of other female employees, appears to be Ms. Heidarpour:



**Evidence of Manufactured Claims Referred by HLF**

55. Everything in this section is based on public information or facts that have already been shared with opposing counsel. None of this waives any privilege or work product protection over our investigative files. With that said, based on my personal experience defending dozens of TCPA claims originated by HLF on behalf of Wilson and other plaintiffs, I have observed a consistent pattern: false or meritless claims are packaged and referred to outside litigation counsel who may not know the claims' true provenance, and the claims are abandoned only when the underlying fraud is directly exposed.

56. Over the course of my practice, my firm has defended dozens of claims originated by HLF. On numerous occasions, we discovered evidence that the lead forms underlying those claims appeared to have been filled out by the plaintiff himself or by someone with a financial interest in the litigation—in some instances through IP address evidence tracing the form submissions to the plaintiff's geographic location, including in at least one case a remote town with only a few thousand residents. When confronted with this evidence, outside litigation counsel—to whom HLF had referred the cases—dismissed with prejudice in an attempt to avoid sanctions.

57. In addition to filed cases, my firm has received dozens of pre-suit demand letters from HLF threatening TCPA class actions against my clients on behalf of Wilson and other plaintiffs. On multiple occasions, after we responded in writing, suggesting that we had evidence the claims were manufactured and describing what we believed to be an

ongoing fraudulent scheme, HLF abandoned the claim without any response. It disappeared entirely. To my knowledge, none of those abandoned claims were subsequently filed or referred to other counsel. Ever since we let HLF know that we suspected fraud, not a single demand letter that we responded to (and thus that HLF knew we were on the other side of) has resulted in a lawsuit. That was a marked change from before we told them about the suspected fraud, when they used to refer cases we responded to out to litigation counsel all the time.

58.     More recently, the undersigned represented several defendants in cases brought by another serial plaintiff, Sara Taylor. The parallels to this case are shocking. After obtaining a new telephone number in 2024 and connecting with HLF, Taylor became the named plaintiff in at least 20 TCPA class action lawsuits in less than a year—after her number was submitted to dozens of companies through hundreds of lead forms designed to appear as though they came from Missie Gosset, a felon with multiple federal fraud convictions living roughly 100 miles away with a similar phone number. VPNs and remote-access tools were used to make the leads appear to originate from Gosset's hometown and IP address, though Gosset denied submitting the leads. When we shared those findings and the other information about HLF described above, outside counsel dismissed both cases with no payment. Despite filing at least 20 back-to-back class actions before we revealed the suspected fraud, she never filed another case—her last filing was in August, 2025.

59.     Wilson's cases are following a similar pattern. It is true that Wilson's number genuinely attracts misdirected contacts, as appears to be the case here.

60.     But as in other cases originated by HLF that start legitimately, the leads that began appearing after Wilson executed an agreement with the firm (on October 4, 2024) are different in kind, and indicative of fraud.

61.     On October 12, 2024, eight days after the first HLF agreement, a lead was submitted pairing Wilson's number with a borrowed identity and an email address that appears to belong to no one.

- 13 -

62. On December 6, 2024, Wilson's number was globally opted out of a client's systems in response to a demand. Seven months later, the same number was resubmitted under a different person's name, reactivating the texts. Suit followed within two weeks, and the "revocation of consent" claims pled allowed Wilson to plead around another pending claim.

63. Recently, the Heidarpour Law Firm sent one of the undersigned's clients a demand letter claiming Wilson received text messages in violation of the TCPA. But this instance showed that someone was not accidentally inputting Wilson's 999-9999 number into lead forms to avoid calls. That's because the sole reason someone would have entered their name into this lead form was to receive free timely stock alerts. Why would someone go to the trouble of putting a fake number into a lead form where the only point was to get texts? Proving the answer to our question, when confronted with this information, the outside counsel to which Heidarpour had farmed out the claim dropped it completely.

64. The instances described above are representative of a broader pattern I have observed across dozens of matters. In case after case, claims originated by the Heidarpour Law Firm are abandoned with prejudice when the underlying facts are investigated and Defense counsel shares its suspicion of fraud with opposing counsel. The same pattern is reflected in *Wilson v. MAH Group, Inc.*, No. 6:25-cv-855 (D. Or.). Attached hereto as **Exhibit W** is a true and correct copy of the Declaration of Neal Shechter in Support of Defendant's Opposition to Plaintiff's Second Motion for Attorney's Fees and Other Sanctions, filed in that action on April 14, 2026.

## Wilson's Agreements with HLF

65. In *Wilson v. Freeway*, Freeway served a subpoena on HLF seeking, among other things, the agreements governing HLF's representation of Wilson and information concerning the fees and recoveries in Wilson's other TCPA matters.

66. In response, the Heidarpour Law Firm hired an AmLaw10 white collar criminal defense team at Milbank, which refused to produce that information. It characterized the request as a "fishing expedition" and asserted that what the Heidarpour

Law Firm "recovered in unrelated settlements" has "no bearing" on this case. The Heidarpour Law Firm also tried to intimidate Freeway with several threats to seek sanctions. A true and correct copy of the relevant correspondence is attached hereto as **Exhibit O**.

67.     On June 11, 2026, HLF produced 14 pages, including a copy of its October 4, 2024 agreement with Wilson in which the fee provisions had been redacted. HLF marked the production "Confidential" or "Highly Confidential," even though no protective order had been entered and Freeway had not agreed to treat the materials as confidential.

68.     On June 18, 2026, after further correspondence between counsel, HLF produced unredacted copies of the October 4, 2024 agreement and a subsequent agreement concerning Wilson's claims against Freeway. HLF continued to decline to provide the fee terms and recovery information concerning Wilson's other matters.

69.     My firm represents the defendant in another TCPA action in which the plaintiff's claims were suspected to have ties to HLF similar to those at issue here: *Bronstin v. S. Cal. Edison Co.*, No. 8:25-cv-2334 (C.D. Cal.). On June 11, 2026, the defendant served a subpoena on HLF and advised counsel for the plaintiff in that action that it intended to move for summary judgment and denial of class certification. The plaintiff's counsel offered to dismiss the action with prejudice within hours of service, and plaintiff subsequently did so on June 18, 2026.

70.     Attached hereto as **Exhibit P** is a true and correct copy of the Contingent Fee Agreement signed by Plaintiff and HLF on October 4, 2024, which HLF produced in response to the subpoena in *Wilson v. Freeway*. No protective order was entered in that case, nor did Freeway and HLF agree to the confidentiality of any documents exchanged.

71.     Section 1 of the October 4, 2024 agreement states that Wilson retained HLF to represent him "for any and all claims" under the Telephone Consumer Protection Act and Fair Debt Collection Practices Act. Section 3 authorizes HLF, in its discretion, to associate co-counsel on any or all of Wilson's claims. It further provides that a later fee

agreement acknowledging co-counsel's role would supersede the October 4, 2024 agreement only as to the specific claim addressed in the later agreement.

72. Section 7 grants HLF power of attorney to act on Wilson's behalf and to execute "all claims, contracts, settlements, checks, drafts, compromises, covenants, releases, verifications, dismissals and deposits" as though Wilson had done so personally. Section 8 separately authorizes HLF to accept any settlement that HLF considers "practical and reasonable."

73. Section 9 provides that, if Wilson terminates the agreement, HLF has 30 days to settle or relinquish any claims then in negotiation. It also provides that, if Wilson has outstanding claims for which HLF has incurred costs or fees, Wilson must reimburse HLF for the associated costs.

74. Attached hereto as **Exhibit Q** is a true and correct copy of a subsequent August 29, 2025 Contingent Fee Agreement purportedly signed by Wilson, HLF, Anthony Paronich, and Mr. Perrong, which HLF also produced in response to the subpoena in *Wilson v. Freeway*.

75. Section 5 of the August 29, 2025 agreement allocates 30% of any attorneys' fees to HLF, 60% to Paronich Law, P.C., and 10% to Perrong Law. Sections 7 and 8 address an individual, rather than classwide, settlement. They provide that Wilson will receive no more than the statutory damages available for the asserted violations, that the remaining recovery will represent attorneys' fees and costs, and that any amount obtained in excess of Wilson's statutory damages belongs to the attorneys as fees or costs.

76. The October 4, 2024 agreement includes a SignNow audit log identifying Wilson's email address as the signer and recording when the agreement was sent to that address, viewed, completed, and signed. The August 29, 2025 agreement bears a DocuSign envelope number, but HLF's production did not include a corresponding certificate of completion or audit log identifying who opened, viewed, or signed the agreement.

77. On June 24, 2026, Freeway offered to hold HLF's deposition in abeyance while HLF pursued a motion to quash if HLF would identify whether Wilson or someone

- 16 -

at HLF had placed Wilson's signature on the August 29, 2025 agreement. HLF did not provide that confirmation and instead proceeded with an Emergency Motion to Stay and Quash Freeway's subpoena in *In re Subpoena to Heidarpour Law Firm, PLLC*, No. 1:26-mc-00099-RJL (D.D.C.).

### HLF's Agreements with Other TCPA Litigants

78.    On July 27, 2026, attorneys at Greenspoon Marder, defense counsel in another TCPA class action brought by Erin Robertson—another serial litigant whose claims originate with HLF—provided my firm with documents bearing Bates numbers HLF00001 through HLF00259. HLF had produced those documents in response to a subpoena issued in *Robertson v. Plain-English Media, LLC*, No. 3:24-cv-429 (D. Nev.) ("*Robertson v. Plain-English*"). The materials included a declaration executed under penalty of perjury by Andrew Heidarpour as authorized representative of HLF, averring that the "documents produced herewith and Bates stamped HLF00001 through HLF00259 are true and correct copies of records maintained by HLF in the ordinary course of business." A true and correct copy of that declaration is attached hereto as **Exhibit R**.

79.    Attached hereto as **Exhibit S** is a true and correct copy of a Contingent Fee Agreement executed by HLF and Erin Robertson on June 4, 2024 ("June 4 Robertson Agreement"), which HLF produced to Greenspoon Marder in response to the subpoena issued in *Robertson v. Plain-English*.

80.    Like HLF's October 4, 2024 agreement with Wilson (Exhibit P), the June 4 Robertson Agreement covers "any and all" of the claimant's claims under the Telephone Consumer Protection Act and Fair Debt Collection Practices Act. It authorizes HLF to associate co-counsel on any or all such claims and provides that any later agreement with co-counsel supersedes the original agreement only as to the specific claim covered by the later agreement.

81.    The agreement also grants HLF power of attorney to execute claims, settlements, checks, releases, dismissals, and other documents on the claimant's behalf; authorizes HLF to accept any settlement it considers practical and reasonable; and gives

- 17 -

HLF 30 days after termination to settle or relinquish claims then in negotiation. It further requires the claimant to repay costs incurred on outstanding claims and prohibits direct communication with an alleged violator after retaining HLF.

82. I reviewed the claim-specific engagement agreements contained in HLF's production. Each postdates the June 4, 2024 agreement. The earliest is dated June 25, 2024, and appears at HLF00057 through HLF00059.

83. Attached hereto as **Exhibit T** is a true and correct copy of one representative agreement, bearing Bates numbers HLF00001 through HLF00007 and dated August 2, 2024. Like Wilson's August 29, 2025 agreement, it limits the claimant's individual recovery to the statutory damages available for the alleged violations, provides that any remaining or excess recovery belongs to counsel as attorneys' fees or costs, and allocates 30% of the attorneys' fees to HLF.

84. HLF's production also included 18 "settlement statements" bearing Bates numbers HLF00228, HLF00235 through HLF00236, HLF00241 through HLF00243, and HLF00248 through HLF00259. Each statement identifies the settlement amount, the amount allocated to attorneys' fees and costs, and the amount allocated to the claimant. Each also contains a declaration in the claimant's name authorizing the stated disbursements and a release of claims. The releases were substantially identical and read as follows:

> I, ERIN ROBERTSON, RELEASE, ACQUIT, AND FOREVER DISCHARGE RELEASE [*sic*] PARONICH LAW, P.C., ANTHONY PARONICH, HEIDARPOUR LAW FIRM, PLLC, ANDREW HEIDARPOUR, FROM ANY AND ALL MANNER OF ACTIONS, CAUSES OF ACTION, SUITS, JUDGMENTS, DEMANDS, CLAIMS, RIGHTS, INTERESTS, REMEDIES OF ANY NATURE, KIND OR DESCRIPTION WHATSOEVER IN LAW OR IN EQUITY THAT I HAD, NOW HAVE, OR MAY HAVE AGAINST THEM, WHETHER KNOWN OR UNKNOWN, UP TO AND INCLUDING THE DATE OF MY SIGNATURE, INCLUDING BUT NOT LIMITED TO IN RELATION TO [*sic*] LITIGATION AGAINST [THE DEFENDANT(S)].

True and correct copies of those settlement statements are attached hereto as **Exhibit U**.

- 18 -

85.     On July 7, 2026, in response to a post by a Jewish Israeli man living in Tel Aviv, Israel, Plaintiff wrote on the social media platform Threads: "Stay there f@g-hat beak nose POS. Needed to ship the rest of you back… To the bottom of the ocean." Attached hereto as **Exhibit V** is a true and correct copy of a post reflecting those statements.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 4, 2026 in Atlanta, Georgia.

Signed by:

*Ryan Watstein*

4392D345121B404...

Ryan D. Watstein

- 19 -